IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**TWIN CITY FIRE INSURANCE COMPANY**,
*Plaintiff/Counter-Defendant/Appellee*,

*v.*

**GRACIELA LEIJA**,
*Defendant/Counter-Claimant/Appellant.*

---

No. CV-17-0280-PR
Filed August 2, 2018

---

Appeal from the Superior Court in Maricopa County
The Honorable Michael J. Herrod, Judge
The Honorable J. Richard Gama, Judge, (Retired)
No. CV2012-004506
**AFFIRMED**

Opinion of the Court of Appeals, Division One
243 Ariz. 175 (App. 2017)
**AFFIRMED IN PART, VACATED IN PART**

---

COUNSEL:

Donald L. Myles, Jr., Jefferson T. Collins, Lori L. Voepel (argued), Jones, Skelton & Hochuli, P.L.C., Phoenix, Attorneys for Twin City Fire Insurance Company

Joel B. Robbins (argued), Anne E. Findling, Robbins & Curtin, PLLC, Phoenix; and David L. Abney, Ahwatukee Legal Office, P.C., Phoenix, Attorneys for Graciela Leija

Mark A. Kendall (argued), CopperPoint Mutual Insurance Company, Phoenix, Attorneys for Amicus Curiae CopperPoint Mutual Insurance Company

Nathan B. Webb, Miller, Pitt, Feldman & McAnally, P.C., Tucson, Attorneys for Amici Curiae Mark Ballinger and Patricia Ballinger

Taylor C. Young, Mandel Young PLC, Phoenix, Attorneys for Amicus Curiae American Insurance Association

David W. Lippman, Lippman Recupero, Tucson, Attorneys for Amicus Curiae National Association of Subrogation Professionals

———————————

JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES TIMMER, GOULD, and LOPEZ joined. JUSTICE BOLICK concurred in the result.

———————————

JUSTICE PELANDER, opinion of the Court:

¶1 Under the Arizona Workers' Compensation Act (the "Act"), an insurance carrier obtains a lien on a claimant's (or a claimant's dependents') recovery from third persons who negligently injured or killed the claimant to the extent of workers' compensation benefits paid (less reasonable and necessary expenses incurred in securing the recovery). A.R.S. § 23-1023(D). In *Aitken v. Industrial Commission*, this Court held that the insurance carrier may assert the lien "only to the extent that the compensation benefits paid exceed the [non-party] employer's proportionate share of the total damages fixed by verdict in the [third-party] action." 183 Ariz. 387, 392 (1995). We today hold that a claimant who settles all of his or her third-party claims is not entitled to a post-settlement trial to determine the percentage of employer fault solely to reduce or extinguish the insurance carrier's lien.

## I.

¶2 Victor Leija died while working as a window washer when he fell from a building after a scaffold collapsed. Victor's widow and children (collectively, "Leijas") claimed workers' compensation benefits through Victor's employer's workers' compensation carrier, Twin City Fire Insurance Company ("Twin City"). Twin City accepted the claim and pays monthly benefits of $1857 to the Leijas. Eventually, the payments will total approximately $575,000.

¶3        Exercising their right under the Act to bring a tort claim against any third person who negligently caused Victor's death, *see* § 23-1023(A), the Leijas filed a negligence action against the City of Glendale, which owned the building from which Victor fell, the building's property manager and maintenance company, and the companies that furnished and fabricated the scaffold.

¶4        During settlement negotiations between the Leijas and the third-party defendants, Twin City asserted its right under § 23-1023(D) to fully enforce a lien against all settlement proceeds for the amount of workers' compensation benefits it had paid and would pay in the future. Nevertheless, Twin City offered to reduce its lien by five percent if the Leijas settled all their third-party claims. The Leijas rejected the offer, arguing that Twin City was required to reduce its lien by more than five percent due to the alleged comparative fault of Victor's employer in causing the accident. Although Twin City did not object to any settlement, it never wavered from its position that it was not required to reduce its lien. The Leijas ultimately settled with all the third-party defendants for $1.6 million.

¶5        After that settlement, Twin City filed this action against the Leijas to enforce its lien. Consistent with its pre-settlement position, Twin City sought to fully enforce its lien under § 23-1023(D) against all the settlement proceeds to the extent of past and future workers' compensation benefits. The Leijas counterclaimed, arguing, as relevant here, that Twin City breached its duty of good faith and fair dealing by refusing to reduce its lien to account for Victor's employer's alleged comparative fault. Alternatively, the Leijas requested that the superior court set a trial to establish the employer's proportionate fault and the resulting amount of Twin City's lien.

¶6        On the parties' cross-motions for summary judgment, the superior court ruled in Twin City's favor, reasoning that "a separate action after compromise of the third-party claim is not the appropriate vehicle to allocate fault" to a non-party employer. The court further reasoned that, contrary to the Leijas' assertions, a workers' compensation insurance carrier does not owe a duty of good faith and fair dealing to reduce its lien against a claimant's settlement proceeds to account for a non-party employer's alleged comparative fault.

¶7        The court of appeals reversed, holding that "when a worker settles a claim against a third party for less than the limits of the third party's insurance, the worker may obtain a judicial determination of whether the carrier's lien should be reduced to account for the employer's

comparative fault." *Twin City Fire Ins. Co. v. Leija*, 243 Ariz. 175, 177 ¶ 1 (App. 2017). The court reasoned that "the fact that the Leijas settled their [third-party] claims rather than try them to a verdict does not preclude equitable apportionment under *Aitken*." *Id.* at 181 ¶ 20. The court observed that "the settlement with [the City of] Glendale did not touch multiple layers of coverage and the record contains significant evidence of employer fault." *Id.* ¶ 21. Therefore, the court stated, Twin City's lien should be equitably apportioned because "estimations of [Victor's] employer's comparative fault undoubtedly affected the amount the Leijas were able to recover in settlement." *Id.* ¶ 19. The court of appeals remanded the case to the superior court to set "a trial to equitably apportion Twin City's lien" and directed that court to "address the specifics of such a proceeding," including "whether damages and the employer's comparative fault should be determined by the court or by a jury." *Id.* ¶ 23.

¶8        Finally, because the court of appeals "ruled that the Leijas have a right to a trial by which Twin City's lien may be apportioned," it found "no need" to reconsider the principle that a workers' compensation carrier does not breach its duty of good faith and fair dealing when, "absent a fair adjudication of damages and employer comparative fault," it refuses to compromise or reduce its lien under § 23-1023(D). *Id.* at 182 ¶ 28.

¶9        We granted review because this case presents recurring issues of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶10        We review legal questions, including statutory issues, de novo. *In re Marriage of Friedman & Roels*, 244 Ariz. 111, 114 ¶ 11 (2018).

¶11        The Arizona Constitution requires the legislature to "enact a workmen's compensation law" that generally permits a worker to collect compensation when he or she is injured in the course of employment. Ariz. Const. art. 18, § 8. The legislature implemented this constitutional mandate shortly after statehood. *Grammatico v. Indus. Comm'n*, 211 Ariz. 67, 70 ¶ 13 (2005). The Act, now codified in A.R.S. §§ 23-901 to -1091, generally provides that every employee is "entitled to receive and shall be paid . . . compensation" for the loss sustained due to the employee's injury when the employee's accidental injury or death occurred in the course of the employee's employment. § 23-1021.

¶12        An employer who complies with the Act is generally immune from tort liability for an employee's accidental injury or death that occurred

in the course of the employee's employment.   § 23-906(A); *see also* § 23-1022(A) (stating that an employee's "right to recover compensation" under the Act is generally "the exclusive remedy against the employer or any co-employee acting in the scope of his employment"); § 23-1024(A) (stating that "[a]n employee . . . who accepts compensation waives the right to exercise any option to institute proceedings in court against his employer or any co-employee acting within the scope of his employment").

¶13        Although an employer is generally immune from tort liability when an employee accepts compensation under the Act, the employee may bring a tort claim against a third person when the employee was "injured or killed . . . by the negligence or wrong" of the third person. § 23-1023(A). When an employee brings such a third-party claim, the Act vests the employer's insurance carrier with a lien on any recovery (less reasonable and necessary expenses) that the employee collects from the third-party to the extent of the compensation benefits paid by the insurance carrier. § 23-1023(D); *see also Dietz v. Gen. Elec. Co.*, 169 Ariz. 505, 511 (1991) (noting that "the lien provisions in favor of immune employers have been part of the workers' compensation system since 1925").  This case concerns the application of this lien on an employee/claimant's settlement proceeds recovered from third-party defendants.

¶14        After the legislature abolished joint and several liability by amending the Uniform Contribution Among Tortfeasors Act in 1987, we ruled in *Dietz* that a third-party defendant may name a plaintiff/employee's employer as a non-party at fault under A.R.S. § 12-2506.   169 Ariz. at 510–11; *see also* § 12-2506(B) (stating that "[i]n assessing percentages of fault the trier of fact shall consider the fault of all persons who contributed to the alleged injury . . . regardless of whether the person was, or could have been, named as a party to the suit"); Ariz. R. Civ. P. 26(b)(5) (requiring notice for claims of non-party fault).

¶15        Following *Dietz*, this Court recognized in *Aitken* that permitting a third-party defendant to name a plaintiff/employee's employer as a non-party at fault creates an inequity when a trier of fact allocates some percentage of fault to the non-party employer. 183 Ariz. at 390–91. That is so, we reasoned, because such an allocation forces the plaintiff "to endure the combined effect of first having his or her award reduced by reason of the employer's fault, and thereafter having to satisfy a lien against this diminished recovery in favor of the employer and its carrier to the full extent of compensation benefits provided." *Id.* at 392.

¶16 To cure this inequity, *Aitken* held that "a carrier may assert a lien on a third party recovery only to the extent that the compensation benefits paid exceed the employer's proportionate share of the total damages fixed by verdict in the [underlying] action." *Id.*; *see also Grijalva v. Ariz. State Comp. Fund*, 185 Ariz. 74, 76 (1996) (stating that *Aitken*'s equitable apportionment rule applied "following a contested third party trial that necessitated a determination of liability *and* damages, including the apportionment of fault among parties and nonparties as required by law"); *Weber v. Tucson Elec. Power Co.*, 202 Ariz. 504, 504–05 ¶ 1, 506–07 ¶ 10 (App. 2002) (concluding that equitable apportionment applied when a plaintiff/employee brought a tort claim against two third-party defendants, settled with one of them, and prevailed against the other defendant at trial, in which the jury assigned fault to the non-party employer, because the claimant's damages were in fact reduced due to the non-party employer's fault and because the trial was not "a sham or collusive proceeding that resulted in extraneous and irrelevant findings on damages or the apportionment of fault").

¶17 Neither party nor any amicus has urged us to overrule *Aitken* or otherwise revisit its equitable apportionment rule as applied to contested cases that are tried to a verdict. Notably, in *Aitken* we explicitly invited the legislature to amend § 23-1023(D) if it disagreed with our interpretation of it. 183 Ariz. at 393. Despite that invitation, the legislature has not statutorily abolished or modified the equitable apportionment rule that *Aitken* embraced, even though the legislature amended an unrelated part of § 23-1023(D) in 2012. 2012 Ariz. Sess. Laws, ch. 240, § 1 (2d Reg. Sess.). Therefore, we assume, without deciding, *Aitken*'s continued validity and adherence to legislative intent in applying the lien provision.[1]

---

[1] In his concurring opinion, Justice Bolick faults the Court in *Aitken* for unconstitutionally usurping legislative powers it does not have and improperly rewriting the law. *Infra* ¶¶ 31, 38 (Bolick, J., concurring in the result). Professing to "police our constitutional boundaries," he therefore urges us to "overturn *Aitken* and return this issue to the legislature, where it belongs." *Infra* ¶ 46. Its nautical humor aside, *infra* ¶¶ 32–35, the concurrence disregards that courts generally refrain from addressing questions the parties did not raise — especially when doing so would, assuming the concurrence is correct, require us to sua sponte overrule our prior case law. *See Dolan v. United States*, 560 U.S. 605, 619 (2010) (refusing to depart from the Court's precedents "when *this* case does not require us to do so" and when "the issue has not been adequately briefed" and lower courts "had no opportunity to consider the argument"); *State ex rel. Brnovich*

¶18 In contrast to the contested third-party action that was tried to verdict in *Aitken*, *Grijalva* involved a plaintiff/employee's "pretrial attempt to settle a third party claim without approval of the compensation carrier," followed by an "apportionment of fault apparently carried out for the sole purpose of impacting the carrier's lien rights." 185 Ariz. at 76. This Court viewed that as an "artful contrivance[]" that "*Aitken* neither requires nor authorizes." *Id.* at 76–77. Indeed, we stated that if a plaintiff/employee "is entitled to receive or has received settlement proceeds" from a third-party defendant, then the insurance carrier "has a lien and/or a future credit against those proceeds." *Id.* at 77; *see also Stout v. State Comp. Fund* (*Stout I*), 197 Ariz. 238, 240 ¶ 7, 242 ¶ 15 (App. 2000) (rejecting plaintiff/employee's argument that "the rule of equitable apportionment from *Aitken* should apply to cases that are resolved by settlement" and concluding that "equitable apportionment does not apply when a third-party action is settled at policy limits and there is no evidence that employer fault affected the offer to settle at policy limits").

¶19 Twin City argues that claimants who settle all their third-party claims "should not be granted post-settlement trials to determine the percentage of employer fault," and insurance carriers should not be forced "to reduce their liens accordingly." It reasons that *Aitken* and *Grijalva* impose an equitable apportionment rule only when "two conditions are met: (1) the employer's share of fault was determined by verdict and applied to reduce the claimant's damages; and (2) the verdict was obtained in the third-party action." According to Twin City, "[w]ithout the statutorily required reduction of a claimant's recovery based on the percentage of employer fault apportioned by a jury in the third-party action, there is simply no *Aitken*-type of inequity to ameliorate."

¶20 The Leijas, on the other hand, argue that "[t]here is no justification for failing to offset the lien amount for an employer's fault simply because the parties have, with the [insurance] carrier's consent, settled before trial." Under the Leijas' view, a claimant should not "be

---

*v. City of Tucson*, 242 Ariz. 588, 599 ¶ 45 (2017) (stating that "[w]e generally do not reach out . . . to upset established precedent when no party has raised or argued such issues"); *State v. Valenzuela*, 239 Ariz. 299, 306 ¶ 21 (2016) (declining to address issues "[t]he parties did not brief"); *cf. Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2409 (2015) (stating that "*stare decisis* carries enhanced force when a decision . . . interprets a statute," even when the decision relied not on statutory text alone but on "the policies and purposes animating the law," because the legislature may alter what the Court does).

penalized twice for the employer's fault, first by having to compromise during settlement negotiations, and second, by having a lien placed on an already reduced settlement for the full amount of compensation benefits, without any consideration of employer fault."

¶21   We agree with Twin City. Neither *Aitken* nor *Grijalva* authorizes the post-settlement trial process proposed by the court of appeals. *Aitken* expressly limits application of the equitable apportionment rule to situations where a claimant's total damages are "fixed by verdict" in the third-party action. 183 Ariz. at 392. *Grijalva* likewise expressly recognized and applied that limitation. 185 Ariz. at 76–77. In the settlement context, a claimant's proceeds are not "fixed by verdict," *Aitken*, 183 Ariz. at 392, and a settlement between a claimant and a third-party defendant does not "necessitate[] a determination of liability *and* damages, including the apportionment of fault among parties and nonparties," *Grijalva*, 185 Ariz. at 76. Simply stated, neither the applicable statutes nor our prior decisions authorize a post-settlement trial process.

¶22   In addition, there are good reasons to limit application of the equitable apportionment rule to only those cases that are tried to verdict. The inequity we recognized in *Aitken* will exist in *every* such case when the jury allocates some percentage of fault to a non-party employer. But that inequity will not exist in every case where a claimant settles with a third-party defendant. It is purely speculative to assume that, based solely on a claimant and a third-party defendant settling at some amount below the defendant's insurance policy limits, the claimant's recovery was reduced by the non-party employer's alleged fault. In short, a third-party defendant's insurance policy limits are not a proxy for employer fault.

¶23   Many factors may influence a plaintiff/employee's decision to settle with a third-party defendant and the settlement amount. Indeed, a claimant may settle below a third-party defendant's insurance policy limits for many reasons that have nothing to do with employer fault. For example, the claimant may not have suffered a severe injury, might have difficulty proving fault or causation on the part of the third-party defendant, or might be risk-averse and would prefer a potentially smaller recovery to avoid the risk of trial, including the risk that the jury will apportion a substantial amount of fault to the claimant or the claimant's employer. *Cf. id.* at 77 (observing that "it is uncertainty about the result that most often leads to settlement"). There is no basis to assume that in *every* settlement between a claimant and a third-party defendant, the claimant suffered the inequity that *Aitken* sought to cure.

¶24            Notably, an insurance carrier could also be concerned with the risk that a jury will apportion a substantial amount of fault to the claimant or the claimant's employer because that could adversely affect the carrier by reducing the claimant's recovery and, consequently, the value of the carrier's lien.    Therefore, a carrier may understandably wish to incentivize the claimant to settle by voluntarily reducing its lien in exchange for a settlement. *Cf. Boy v. Fremont Indem. Co.*, 154 Ariz. 334, 337 (App. 1987) ("By compromising its lien to help achieve settlement, the insurer may guarantee at least some recovery for itself.").

¶25            Moreover, the post-settlement trial process proposed by the court of appeals would itself create perverse incentives and inequities. Generally, a claimant in a third-party action "has every incentive to maximize the percentage of fault allocated to the third-party defendant" because the claimant wants to receive the highest amount of damages he or she can obtain. *Stout v. State Comp. Fund* (*Stout II*), 202 Ariz. 300, 303 ¶ 11 (App. 2002).  Consequently, the claimant "necessarily has every incentive to *minimize* the percentage of fault allocated to the employer" because "any fault assigned to the employer will typically reduce that assigned to the third-party defendant." *Id.*

¶26            But a post-settlement trial process would transform this incentive structure.  Under the court of appeals' construct, a claimant would try to maximize a third-party defendant's fault (and therefore to minimize the fault attributable to the claimant's employer) so as to maximize the amount of the claimant's settlement.  Then, in the post-settlement trial with the insurance carrier, the claimant would be incentivized to take the diametrically opposite position by maximizing the fault attributable to the employer (and therefore minimizing the fault accruing to the settling third-party defendant) solely to reduce or extinguish the insurance carrier's lien on the settlement proceeds.

¶27            Even assuming that an insurance carrier's refusal to waive or reduce its lien might be inequitable in some circumstances, it is difficult to understand how the possible gamesmanship created by a post-settlement trial process is more equitable than permitting an insurance carrier to exercise its statutorily authorized lien on a claimant's settlement proceeds to the extent of compensation benefits paid when, for the reasons previously discussed, there may be no inequity at all.  Accordingly, we hold that a claimant who settles all his or her third-party claims may not obtain a post-settlement trial to determine the percentage of employer fault solely to reduce or extinguish the insurance carrier's lien.

¶28          In so holding, we recognize that even in a settlement context, an insurance carrier has an obligation to act in good faith toward a claimant by giving equal consideration to the claimant's interests. *See Stout I*, 197 Ariz. at 242 ¶¶ 19–22; *cf. Boy*, 154 Ariz. at 335, 337 (concluding pre-*Aitken*, that workers' compensation insurer "did not breach its duty to act in good faith when it refused to compromise its lien against any [third-party] recovery," and noting that "[t]he duty of good faith . . . merely requires the insurer to give equal consideration to the interests of both parties"). Under these circumstances, as amicus CopperPoint Insurance Company acknowledged at oral argument, good faith might entail a workers' compensation insurer considering and reasonably acting on a claimant's request to reduce the lien on third-party settlement proceeds, particularly when evidence of employer fault is clear, undisputed, and substantial.

¶29          The record in this case includes some evidence of employer fault. Perhaps for that reason, Twin City offered to reduce its lien by five percent if the Leijas settled with the third-party defendants. In view of that offer and the Leijas' failure to preserve or argue in this Court any issue relating to their bad faith claim, we have no basis for overturning the superior court's grant of summary judgment in favor of Twin City on that claim. *See Stout I*, 197 Ariz. at 243 ¶ 22 (stating that because "a carrier's statutory lien has strong protection under the law," "the carrier may reasonably protect its right to recover the lien amount" and is "not required to completely disregard its own interests").

## III.

¶30          For the reasons stated above, we affirm the superior court's judgment in favor of Twin City as it relates to the enforcement of Twin City's lien and the Leijas' bad faith claim. We vacate paragraphs 9 through 28 of the court of appeals' opinion as well as paragraphs 1 and 33 to the extent they are inconsistent with this opinion. We affirm the balance of the court of appeals' opinion.

JUSTICE BOLICK, concurring in the result.

¶31          I join my colleagues' resolution of this difficult case. However, its difficulty is in large part the byproduct of the decision twenty-three years ago in *Aitken* that the Court should rewrite rather than apply the statutes governing the issues before us. The Court today chooses not to address whether we exceeded our constitutional powers in doing so, because the parties have not asked us to overrule *Aitken*. With respect, I disagree.

¶32          The notion that we can ignore the constitutional contours of our authority if the parties do not question it brings to mind a story told by the famed journalist Ambrose Bierce more than a century ago. The story essentially goes that a Supreme Court justice was sitting by a river when a traveler approached and asked, "I wish to cross. Will it be lawful to use this boat?"

¶33          "It will," the justice replied; "it is my boat."

¶34          The traveler thanked him and rowed away. But quickly the boat took on water, forcing the traveler to abandon the journey. An indignant spectator asked the justice, "Why did you not tell him that your boat had a hole in it?"

¶35          "The matter of the boat's condition," the jurist replied, "was not brought before me."[2] *See* Ambrose Bierce, *A Defective Petition*, in 6 *The Collected Works of Ambrose Bierce* 294 (1911).

¶36          The question that supposedly is not before us is the implied premise that this Court's decision in *Aitken*, which we persist in applying today, was a proper exercise of our constitutionally limited powers. *Supra* ¶ 17. In my view, that question, regardless of whether the parties raise it, is *always* properly before us.

¶37          In our constitutional system, which distributes separate and defined powers among the branches of government, no more fundamental tenet exists than that the judiciary must never exercise legislative powers. In *The Federalist*, Alexander Hamilton remarked that "liberty can have nothing to fear from the judiciary alone," but warned that we "have every thing to fear" from a union of judicial and legislative powers. *The Federalist No. 78*, at 298 (The Legal Classics Library ed., 1983). Following nearly a

---

[2] I am indebted to Chief Justice Stephen Markman of the Michigan Supreme Court for a version of this story.

century and a quarter of experience with the national constitution, the Arizona Constitution's framers considered separation of powers so important that they enshrined it in its own article, decreeing that the three branches "shall be separate and distinct, and no one . . . shall exercise the powers properly belonging to either of the others." Ariz. Const. art. 3. Specifically, the judicial power "does not license judges to craft new laws to govern future conduct, but only to 'discer[n] the course prescribed by law' as it currently exists and to 'follow it' in resolving disputes between people over past events." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1227 (2018) (Gorsuch, J., concurring) (quoting *Osborne v. Bank of U.S.*, 22 U.S. 738, 866 (1824)).

¶**38**      The Court transgressed that constitutional boundary, for beneficent purposes yet blatantly and overtly, in *Aitken*. 183 Ariz. 387. The case involved the interplay between the lien statute, § 23-1023(D), and the recent legislative abolition of joint and several liability, § 12-2506. The plaintiff argued that the combined effect of the two statutes violated the constitutional guarantee of a just and humane worker's compensation law, Ariz. Const. art. 18, § 8, and the prohibition against laws limiting the amount of damages for death or injury, *id.* art. 2, § 31. *Aitken*, 183 Ariz. at 389. As the Court explained, "a reasonable balance between the rights of employer and employee, consistent with the underlying goals of the compensation scheme, has existed for more than twenty years. That balance appears to have been skewed by the almost complete abolition of joint and several liability." *Id.* at 392.

¶**39**      When a statute is reasonably susceptible of two interpretations, a court may and should construe it in a plausible manner that avoids holding it unconstitutional. *State v. Burbey*, 243 Ariz. 145, 149 ¶ 17 (2017) ("When we can reasonably interpret a statute in a way that preserves its constitutionality, we pursue that course."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 66–68 (2012). But *Aitken* made no pretense that the statute was ambiguous, instead objecting to the statute as written. 183 Ariz. at 390. Indeed, it examined cases from other states applying similar statutory language literally, characterizing the results in those cases as inequitable. *Id.* at 390–91.

¶**40**      Instead of construing and applying the statutory language, the Court wrote into the law "a rule of equitable apportionment," thus "making it function as closely as possible to the way in which it has always operated and in accord with what appears to have been the intent of the legislature at the time of its passage." *Id.* at 393. This it did because "[w]e

know exactly how [the lien statute] is supposed to operate and what it was designed to accomplish because we have been working with and applying it since its enactment in the mid-1960s." *Id.* at 391. The Court reasoned that when the legislature enacted § 12-2506, "it did not anticipate the manner in which compensation liens would operate outside the universe of joint and several liability." *Id.* Given that oversight, "we cannot agree with the suggestion that our courts are powerless to compensate for the clearly unintended consequences of these recent developments in the law . . . . Courts should not limit themselves to the rigid construction or application of a statute when significant changes in circumstance since its enactment produce results plainly contrary to legislative intent." *Id.* Thus, "[w]e now hold that a carrier may assert a lien on a third party recovery only to the extent that the compensation benefits paid exceed the employer's proportionate share of the total damages fixed by verdict in this action." *Id.* at 392.

¶41 The Court may well have been correct that the legislature overlooked the impact the abolition of joint and several liability might have on the lien provisions. And unquestionably, the result was harsh. Neither of those facts, however, licenses courts to rewrite the law.

¶42 *Aitken* proceeded from the fundamentally flawed premise that "[w]e interpret and apply laws so as to further 'the general legislative goals that can be adduced from the body of legislation in question.'" *Id.* (quoting *Dietz*, 169 Ariz. at 510). What a wide-ranging commission that would be, "adducing" not a statute's text, not even the particular statute's intent, but the "general legislative goals" of an entire "body of legislation." Regardless of a court's beneficent motivation, such a self-anointed mandate bestows vast legislative powers upon a branch of government intended to have none.

¶43 We should repudiate the premise and the precedent, both of which are antithetical to our constitutional separation of powers. I certainly cannot say it better than our own abundant opinions and other authorities. "Our task in statutory construction is to effectuate the text if it is clear and unambiguous." *BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 19 ¶ 9 (2018). "It is a universal rule that courts will not enlarge, stretch, expand, or extend a statute to matters not falling within its express provisions." *State ex rel. Morrison v. Anway*, 87 Ariz. 206, 209 (1960). "To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret. If the true construction will be followed by harsh consequences, it cannot influence the courts in administering the law. The responsibility for the justice or wisdom of legislation rests with the

legislature, and it is the province of the courts to construe, not to make, the laws." *Barlow v. Jones*, 37 Ariz. 396, 399–400 (1930) (quoting 25 *Ruling Case Law* 963, § 218); *accord State ex rel. Polk v. Campbell*, 239 Ariz. 405, 408 ¶ 12 (2016) ("We decline to effectively, if not actually, rewrite [the statute], as that is the legislature's prerogative, not ours."). "The question . . . is not what Congress 'would have wanted,' but what Congress enacted . . . ." *Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). Thus, "[t]he absent provision cannot be supplied by the courts. What the legislature 'would have wanted,' it did not provide, and that is the end of the matter." Scalia & Gardner, *supra* ¶ 39, at 94.[3]

**¶44**        In forbidding us legislative powers, the framers were prescient. The precept that courts can divine and effectuate law from intentions unmanifested in statute "is anomalous and philosophically indefensible as violating the separation of powers, and it produces considerable judicial mischief." *Id.* at 349–50. Not only are judges neither empowered nor equipped to perform legislative functions, but courtrooms are ill-suited to a legislative forum. Apart from sweeping legislative pronouncements in cases like *Aitken*, courts render decisions based not on broad social considerations but on the specific facts of the cases and parties before them. *See Sessions*, 138 S. Ct. at 1228 (Gorsuch, J., concurring) ("Nor do judges . . . act in the open and accountable forum of a legislature, but in the comparatively obscure confines of cases and controversies."). To determine how the judicial rule applies to different situations requires parties to either speculate or file more cases — and we have had quite a number, including *Grijalva*, 185 Ariz. 74, *Stout I*, 197 Ariz. 238, and *Stout II*, 202 Ariz. 300. Because of the ad hoc nature of litigation, once we enter the lawmaking arena, we must necessarily construct the law as we go along. Tellingly, the portions of the Court's opinion that apply the law to the facts, *supra* ¶¶ 19–29, reference only court decisions and not statutes, for perfectly good reason: *there is no statute to apply*. So that those who consult the statutes in this area will be misinformed, because the applicable rule exists only in an evolving series of court decisions.

**¶45**        I join the result today because my able colleagues have conscientiously navigated our prior decisions in a way that does not further extend the gulf between the statutes and our jurisprudence. However, the fact that our able colleagues on the court of appeals conscientiously reached

---

[3] In this instance, had the Court struck down the statutory scheme as unconstitutional in *Aitken*, it would have comported with separation of powers by preserving the legislature's role in determining whether and how to replace it.

a different decision highlights how difficult it is to predict from our prior opinions what we will decide next.

¶46 I join only the result, however, because we would do better to overturn *Aitken* and return this issue to the legislature, where it belongs. I recognize that the parties have not asked us to overrule *Aitken*, nor would I expect them to do so given that such a request is usually unnecessary to the outcome and might imply that existing law is not on that party's side. However, it is up to us to police our constitutional boundaries, and, by failing to overrule *Aitken*, we continue to exercise legislative powers we do not possess.

¶47 I also recognize that doing so could force us to confront two pillars of the *stare decisis* doctrine: legislative acquiescence and the reliance interest in our existing caselaw. In most cases, either basis would militate strongly in favor of maintaining precedent interpreting statutes, but for the following reasons they should not prevail here.

¶48 The Court observes that *Aitken* "explicitly invited" the legislature to change the statutes if it disagreed with the decision but it has not done so. *Supra* ¶ 17. The legislature's failure to RSVP to a judicial invitation cannot insulate a decision from reconsideration. As the United States Supreme Court has admonished, "the doctrine of legislative acquiescence is as best only an auxiliary tool for use in interpreting ambiguous statutory provisions." *Jones v. Liberty Glass Co.*, 332 U.S. 524, 533–34 (1947). That limited use makes sense: if the court is choosing between two equally plausible statutory interpretations and the legislature does not disturb its holding, we generally should not disturb it either.

¶49 In *Aitken*, of course, there was nothing ambiguous in the statute, thus we should not impute to the legislature an intent to embrace the de facto statute the Court created. As we recognized recently, "The doctrine of legislative acquiescence is limited to instances in which the legislature has considered and declined to reject the relevant judicial interpretation." *Delgado v. Manor Care of Tucson*, 242 Ariz. 309, 314 ¶ 24 (2017) (internal quotation marks omitted) (quoting *Sw. Paint & Varnish Co. v. Ariz. Dep't of Envtl. Quality*, 194 Ariz 22, 25–26 ¶ 21 (1999)). Here, the Court notes that the legislature subsequently changed an unrelated part of the statute. *Supra* ¶ 17. However, "we do not presume legislative intent when a statute is amended in ways unrelated to the judicial construction at issue absent some affirmative indication the legislature considered and approved our construction." *Id.* (internal quotation marks omitted) (quoting *Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 106 (1993)); *accord Sw. Paint*

*& Varnish Co.*, 194 Ariz. at 26 ¶ 21 ("We have squarely rejected the idea that silence is an expression of legislative intent."). The Supreme Court applies the doctrine only when there is "overwhelming evidence," *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001), that Congress explicitly considered the "precise issue" presented to the court, *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983); *see also Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007). Mere inaction and passage of time are insufficient to invoke the doctrine.

¶50        However, even if the legislature had explicitly considered the Court's handiwork and voted unanimously to present us with an award for work well done, that would still be insufficient to sustain the precedent in this case. The legislature cannot, by either acquiescence or abdication, confer upon us legislative powers. That matter was already decided by our constitution. Ariz. Const. art. 3; *see also Sessions*, 128 S. Ct. at 1227 (Gorsuch, J., concurring).

¶51        Finally, it is usually inappropriate to upset precedent on which parties have come to rely. Here, I would deal with that issue by making our ruling prospective only, so that parties in litigation before the date of our opinion could still rely on the *Aitken* framework, amorphous as it is. *Cf. Turken v. Gordon*, 223 Ariz. 342, 351–52 ¶¶ 44–49 (2010) (prospective application is appropriate when a ruling overturns settled precedent, establishes a new legal principle, or would produce inequitable results if retroactively applied).

¶52        The legislature, not the courts, should resolve the policy conundrum that was before us in *Aitken* and has reappeared repeatedly in different permutations since then. But until we correct the error, parties aggrieved by uncertainty in the law will continue to bring those issues to us, rather than to the branch of government that is constitutionally empowered to resolve them.