IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

───────────────

**VINCE LEACH, ET AL.,**
*Plaintiffs/Appellants/Cross-Appellees,*

*v.*

**MICHELE REAGAN, IN HER OFFICIAL CAPACITY AS
ARIZONA SECRETARY OF STATE, ET AL.,**
*Defendants/Appellees,*

*and*

**CLEAN ENERGY FOR A HEALTHY ARIZONA COMMITTEE,
AN ARIZONA POLITICAL ACTION COMMITTEE,**
*Real Party in Interest/Appellee/Cross-Appellant.*

───────────────────────────────────────

**CLEAN ENERGY FOR A HEALTHY ARIZONA, AND
ALEJANDRA GOMEZ,**
*Cross-Plaintiffs/Appellees/Cross-Appellants,*

*v.*

**MICHELE REAGAN,
ARIZONA SECRETARY OF STATE, ET AL.,**
*Cross-Defendant/Appellant/Cross-Appellee,*

*and*

**JAVAN D. MESNARD, SPEAKER OF THE HOUSE; AND
STEVE YARBROUGH, PRESIDENT OF THE SENATE,**
*Cross-Claimant Intervenors/Appellants/Cross-Appellees.*

───────────────

Nos. CV-18-0205-AP/EL
CV-18-0230-AP/EL
(Consolidated)
Filed December 6, 2018

───────────────

Appeal from the Superior Court in Maricopa County
The Honorable Daniel J. Kiley, Judge
Nos. CV2018-009919
CV2018-010116
CV2018-010651
CV2018-010658
CV2018-010807
(Consolidated)

**AFFIRMED**

_____

COUNSEL:

Brett W. Johnson, Jennifer Hadley Catero, Kelly Kszywienski, Colin P. Ahler, Andrew Sniegowski, Brianna L. Long, Lindsay Short, Snell & Wilmer L.L.P., Phoenix; Michael T. Liburdi, Nicole M. Goodwin, E. Jeffrey Walsh, Greenberg Traurig LLP, Phoenix, Attorneys for Vince Leach, Glenn Hamer, Justine Robles, John Kavanagh, Jenn Daniels, Jackie Meck, Ashley Ragan, John Giles

Israel G. Torres, James E. Barton II, Saman J. Golestan, Torres Law Group, PLLC, Tempe, Attorneys for Clean Energy for a Healthy Arizona Committee, Alejandra Gomez

Kory Langhofer, Thomas Basile, Statecraft PLLC, Phoenix, Attorneys for Speaker of the House J.D. Mesnard, Senate President Steve Yarbrough

William G. Montgomery, Maricopa County Attorney, M. Colleen Connor, Talia J. Offord, Deputy County Attorneys, Maricopa County Attorney's Office, Attorneys for Maricopa County Defendants/Appellees

Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation, Phoenix, Attorneys for Amicus Curiae Goldwater Institute

Robert G. Schaffer, Lewis Roca Rothgerber Christie LLP, Phoenix, Attorneys for Amicus Curiae Arizona Chamber of Commerce & Industry and the Greater Phoenix Chamber of Commerce

Nicholas J. Enoch, Kaitlyn A. Redfield-Ortiz, Stanley Lubin, Lubin & Enoch P.C., Phoenix, Attorneys for Amicus Curiae International Brotherhood of Electrical Workers Local Union 387

———————

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICE PELANDER joined. CHIEF JUSTICE BALES, joined by JUSTICE PELANDER, filed a concurring opinion. JUSTICE PELANDER filed a concurring opinion. JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ, filed an opinion concurring in part and dissenting in part.

JUSTICE TIMMER, opinion of the Court:

¶1        These expedited election appeals and cross-appeals raise several issues concerning a political action committee's organizational formation, the adequacy of an initiative title, and whether the trial court erred in finding a sufficient number of valid petition signatures to support placement of the Proposition 127, Renewable Energy Standards Initiative on the November 2018 ballot. We previously issued orders affirming the trial court's rulings that the measure qualifies for the ballot. We now explain our reasoning for those orders. (At the election, the voters rejected the measure, but that does not affect our pre-election decisions.)

## BACKGROUND

¶2        Clean Energy for a Healthy Arizona (the "Committee") is a political action committee ("PAC") that sought placement of an initiative measure on the November 2018 general election ballot. To that end, the Committee formed on February 9, 2018, by filing a "statement of organization" with the Secretary of State ("Secretary") on a form provided by her. *See* A.R.S. § 16-906(A). The statement identified and provided contact information for the Committee's chairperson, treasurer, and bank, as required by § 16-906(B). The statement did not identify a "sponsor." *See* § 16-906(B)(1)(b), (2) (requiring a statement of organization to list information about "any sponsor"). On receipt of the statement, the Secretary issued an identification number to the Committee, *see* § 16-906(D), which was then authorized to perform lawful activities, including applying for an initiative petition, *see* § 16-906(G).

¶3 On February 20, the Committee filed an application with the Secretary for an initiative measure that proposes a constitutional amendment to "require electricity providers to generate at least 50% of their annual sales of electricity from renewable energy sources" (the "Initiative"). *See* A.R.S. § 19-111(A) (setting forth initiative application requirements). The application was printed on a form issued by the Secretary, and it included the Committee's identification number where indicated. Upon receipt of the application, the Secretary assigned the Initiative petition a serial number, *see* § 19-111(B), which enabled the Committee to gather the 225,963 valid signatures required to qualify the Initiative for the ballot.

¶4 Two days after the Committee filed its application with the Secretary, NextGen Climate Action ("NextGen"), a California-based entity, made the first of several substantial contributions to the Committee (totaling more than $4 million in the first and second quarters of 2018 alone) by paying FieldWorks, LLC, about $140,000 to gather petition signatures for the Initiative. NextGen's contributions were publicly reported by the Committee in its mandatory campaign finance reports filed on April 17 and July 14. The Committee did not report receiving any contributions during the period before filing its application with the Secretary on February 20.

¶5 Clean Energy for a Healthy Arizona, LLC ("CEHA LLC") formed on February 27, and the Arizona Corporation Commission approved its articles of organization on March 22. According to the Committee, CEHA LLC formed to protect the Committee's officers from personal liability. The Committee amended its statement of organization on May 14 to identify CEHA LLC as its "sponsor." *See* § 16-906(C) (authorizing amendments to the statement of organization). The Committee's campaign finance reports for the first and second quarters of 2018 did not reflect any contributions from CEHA LLC. The Committee did not list NextGen as a sponsor in the amended statement of organization.

¶6 FieldWorks hired, registered, and paid more than 1500 circulators to collect signatures supporting placement of the Initiative on the ballot. On July 5, the Committee filed petition sheets containing 480,707 signatures with the Secretary. The Secretary reviewed the sheets for statutory compliance pursuant to A.R.S. § 19-121.01(A) and determined that 454,451 signatures were eligible for verification. She then randomly selected a five percent sample (22,722 signatures) for verification by county recorders for the counties in which the signatories claimed to be qualified electors. *See* § 19-121.01(B).

¶7　　　　Plaintiffs are qualified electors. On July 19, before completion of the signature verification process, they filed a complaint in the trial court against the Secretary, the Committee, all county recorders, and all members of county boards of supervisors, challenging the petition signatures on several bases and seeking to enjoin placement of the Initiative on the ballot. In an interlocutory judgment entered pursuant to Arizona Rule of Civil Procedure 54(b), the trial court dismissed Plaintiffs' claim alleging deficiencies in the Committee's statement of organization. The court also dismissed the claims against the county recorders and the board members as unripe. In addition, the court rejected the Committee's argument that Plaintiffs can only challenge petition signatures within the random five percent sample submitted to the county recorders for verification. On expedited appeal and cross-appeal, in an order filed August 20 (with an opinion to follow), this Court affirmed the trial court's interlocutory judgment.

¶8　　　　Meanwhile, the county recorders completed their signature review of the five percent sample. After disqualifying some signatures and validating others, they established a 72.37% validity rate. The Secretary applied that rate to the 454,451 signatures eligible for verification, *see* A.R.S. § 19-121.04(A)(3), and concluded that "the estimated total number of valid signatures is 328,908, which exceeds the 225,963 minimum" number of required signatures.

¶9　　　　Plaintiffs filed new complaints against eleven county recorders, alleging they improperly accepted invalid signatures during their reviews. The trial court consolidated these cases with the initial case. Although Plaintiffs raised several challenges, the core issue before the court was whether the Committee had obtained the 225,963 valid signatures required to place the Initiative on the ballot.

¶10　　　　A five-day trial of extraordinary logistical complexity began on August 20. Approximately 5500 exhibits were admitted in evidence, some of which were thousands of pages in length, and more than fifty witnesses testified. Plaintiffs subpoenaed more than 1180 witnesses, most of whom were petition circulators. The trial court struck petition signatures gathered by more than 300 circulators because they either did not comply with their subpoenas, *see* A.R.S. § 19-118(C), or violated statutory requirements when gathering signatures, *see* A.R.S. §§ 19-112(A), -114(A). Ultimately, the court found that the Committee had gathered a sufficient number of valid signatures to place the Initiative on the ballot and therefore

denied Plaintiffs' request for injunctive relief. On expedited appeal, we affirmed the trial court's judgment in an order filed August 29 (again, with an opinion to follow).

¶11　　　　This Court has jurisdiction over this expedited election matter under article 6, section 5 of the Arizona Constitution and A.R.S. §§ 19-118, -122. As noted above, we previously issued orders affirming both the trial court's initial Rule 54(b) judgment and its final judgment with opinions to follow. We have consolidated the appeals and provide a single opinion to explain our reasoning.

## DISCUSSION

### I. The defective statement of organization claim

¶12　　　　Plaintiffs argue the Committee filed a defective statement of organization on February 9 by naming CEHA LLC as a sponsor before it existed, failing to name NextGen as a sponsor, and failing to incorporate "NextGen" into the Committee's name.[1] Consequently, Plaintiffs assert, the Committee never properly formed, and the Initiative application was a nullity under § 19-111(A) because a valid statement of organization was not filed with the application. Because § 19-114(B) provides that signatures on initiative petitions "are void and shall not be counted" if collected by a PAC "prior to the filing of the committee's statement of organization," Plaintiffs claim that none of the petition signatures here are valid and the Initiative fails to qualify for the ballot. *See Pacion v. Thomas*, 225 Ariz. 168, 170 ¶ 12 (2010) (recognizing that § 19-114(B) disqualifies signatures on initiative petitions collected before formation of a PAC).

---

[1] The record does not support the factual foundation for Plaintiffs' argument. As noted above, *see supra* ¶ 2, the February 9 statement of organization did not list a sponsor. CEHA LLC was identified as a sponsor in the amended statement of organization after CEHA LLC was formed. Also, because NextGen had not made any financial contributions to the Committee as of February 9, and Plaintiffs do not point to any evidence that NextGen otherwise established or administered the Committee as of that date, nothing supports the allegation that NextGen served as a sponsor when the Committee filed the February 9 statement of organization. *See* A.R.S. § 16-901(47) (defining "sponsor"). Nevertheless, because we conclude that the trial court properly dismissed Plaintiffs' defective statement of organization claim on a procedural ground, we do not delve further into its merits.

6

¶13      The trial court dismissed this claim without deciding whether the statement of organization was defective, ruling that Plaintiffs did not have a private right of action to make this challenge. Alternately, the court found that Plaintiffs' claim was barred by laches. Reviewing the dismissal of Plaintiffs' claim de novo as an issue of law, *see Coleman v. City of Mesa*, 230 Ariz. 352, 355–56 ¶ 7 (2012), for the reasons below we affirm the trial court's ruling on the first ground and therefore do not address laches.

¶14      Any person may "contest[] the validity of an initiative or referendum measure based on the actions of the secretary of state or compliance with [chapter one of Title 19]." § 19-122(C). The issue here is whether the Plaintiffs' challenge based on the statement of organization identifies grounds for invalidating the initiative measure. The Committee argues, and the trial court agreed, that Plaintiffs' claim can only be asserted under Title 16, which sets forth the required contents for a statement of organization and provides remedies for non-compliance. *See* A.R.S. §§ 16-906(B), -938, -1021. Plaintiffs counter that their claim arises under § 19-122(C) because it challenges both (1) the Secretary's act in accepting a defective application package and issuing an official serial number in violation of § 19-111(A) and (B), and (2) the Committee's failure to file a valid statement of organization with its application as required by § 19-111(A).

¶15      Before resolving this issue, it is useful to consider the interplay between Titles 16 and 19 concerning a statement of organization. An entity wishing to form as a PAC to support or oppose an initiative measure must file a statement of organization in compliance with § 16-906(B). That statute directs how a committee must be named and requires the statement of organization to list other information, including "[t]he name, mailing address, e-mail address, website, if any, and telephone number of any sponsor." § 16-906(B)(2).

¶16      The statement of organization must be filed with a "filing officer," § 16-906(A), who is either the Secretary, for a statewide ballot measure, or a county, city, or town officer, for a local ballot measure, A.R.S. §§ 16-901(27), -928(A). "On filing a statement of organization, the filing officer shall issue an identification number to the committee," § 16-906(D), which implicitly evidences the statement's compliance with § 16-906(B) and authorizes the now-formed committee to "perform any lawful activity," including making expenditures and advocating for an issue, § 16-906(G). The committee must amend its statement of organization within ten days

of any change in committee information. § 16-906(C). Importantly here, nothing in Title 16 provides that if a facially valid statement contains errors or omissions, it is a nullity and voids the PAC's lawful authority.

¶17 Title 16 also provides remedies if a PAC's statement of organization fails to comply with § 16-906(B). On receipt of a complaint by a third party, the filing officer who accepted the statement of organization is authorized to investigate a violation of § 16-906 and refer any violation to an "enforcement officer" for further investigation and proceedings. §§ 16-901(21), -938(A), (C), (E). (Depending on the identity of the filing officer, the "enforcement officer" is either the Attorney General, a county attorney, or a city or town attorney. §§ 16-901(21), -938(C).) "The enforcement officer has the sole and exclusive authority to initiate any applicable administrative or judicial proceedings to enforce an alleged violation of [§ 16-906]." § 16-938(F). If a violation is found, the committee is permitted to avoid any penalty by taking corrective action within twenty days after issuance of a notice of violation. § 16-938(G). The enforcement officer may also initiate civil or criminal proceedings to enforce provisions of Title 16, including § 16-906. *See* § 16-1021.

¶18 A PAC that proposes a statewide or local initiative measure must apply for an official petition serial number by filing an application with the Secretary on a form provided by her. § 19-111(A). The application must provide identifying information, the text of the proposed initiative, and a 100-word summary of the initiative's principal provisions. *Id.*

¶19 The committee must also simultaneously file "its statement of organization" with the Secretary, and if it fails to do so, she is prohibited from accepting the application. *Id.* If a committee files an application with an accompanying statement of organization, the Secretary "shall assign an official serial number to the petition," which is affixed to all petition sheets circulated for signatures. § 19-111(B); *see also* § 19-112 (addressing petition signatures). Signatures collected on initiative petition sheets by a PAC or its agents "prior to the filing of the committee's statement of organization are void and shall not be counted in determining the legal sufficiency of the petition." § 19-114(B).

¶20 We agree with the trial court that § 19-122(C) does not authorize Plaintiffs to either challenge the Secretary's actions or contest the validity of the Initiative based on the statement of organization's alleged non-compliance with § 16-906(B). Those claims do not arise under Title 19.

¶21        First, § 19-111 is not the statutory vehicle for validating a statement of organization. Instead, that statute requires an initiative applicant to file an existing statement of organization, presumably to demonstrate its lawful authority to file an application. There is no requirement in § 19-111 to disclose an existing sponsor, as the dissent repeatedly states. Because a PAC is not formed and cannot perform lawful activities until its statement of organization is filed with the appropriate filing officer under Title 16, § 19-111(A) necessarily contemplates that the statement of organization has previously been filed and an identification number issued under Title 16. *See* § 19-111(A) (requiring the applicant to file "its statement of organization"). Here, for example, the Committee's application included the statement of organization identification number issued under Title 16.

¶22        Second, an applicant satisfies § 19-111(A) by filing its existing statement of organization, even if the statement contains an error or omission. Plaintiffs contend that § 19-111(A) must require a valid statement of organization or applicants could bypass legislative intent by simply jotting "statement of organization" on a paper and filing it. We agree that § 19-111(A) requires an applicant to file a facially valid statement of organization; a bare scribbling would not suffice. But a statement of organization bearing an identification number issued by the appropriate filing officer demonstrates compliance with § 16-906. *See supra* ¶ 16. The PAC is formed and may engage in lawful activity, such as filing an initiative application. *See* §§ 16-906(G), 19-111(A). In short, a statement of organization filed under § 16-906 and accepted by the filing officer, as evidenced by issuance of an identification number, is valid for purposes of § 19-111(A), even if it contains errors or omissions.

¶23        Third, the Secretary is statutorily required to assign an official serial number upon the applicant's filing of an application and a statement of organization. *See* § 19-111(B) ("On receipt of the application [with the accompanying statement of organization], the secretary of state shall assign an official serial number to the petition . . . ."). Nothing in § 19-111, or any other provision in Title 19, authorizes the Secretary to investigate a statement of organization's compliance with § 16-906(B) or to reject an application if a statement is found lacking. Relatedly, nothing in Title 19 authorizes or requires the Secretary to disqualify petition sheets or signatures if the statement of organization, or any amendments to it, did not comply with § 16-906. In contrast, elsewhere in Title 19, the legislature has explicitly stated the Secretary's obligation to investigate the accuracy of

initiative-related filings. *See, e.g.*, § 19-121.01(A)(1)(h) (requiring the Secretary to remove filed initiative petition sheets if the circulator was not properly registered at the time of circulation).

¶24 Fourth, and finally, Title 16 establishes exclusive procedures for challenging a statement of organization. As previously explained, a third party can challenge compliance with § 16-906(B) by filing a complaint with the filing officer, who can then investigate and refer any violations to an enforcement officer. *See* §§ 16-901(21), -938(A), (C), (E). "The enforcement officer has the sole and exclusive authority to initiate any applicable administrative or judicial proceedings to enforce an alleged violation" of the statement of organization requirements. *See* § 16-938(F). And if a violation is found, the committee is permitted an opportunity to take corrective action before suffering a penalty. § 16-938(G). Interpreting § 19-122(C) as authorizing a plaintiff to file a lawsuit to challenge an initiative measure due to an allegedly defective statement of organization would nullify these Title 16 provisions. *Cf. Butler Law Firm, PLC v. Higgins*, 243 Ariz. 456, 459 ¶ 7 (2018) ("Statutes relating to the same subject or general purpose should be considered to guide construction and to give effect to all the provisions involved.").

¶25 The dissent passionately argues that third parties must be entitled to challenge initiative petition signatures based on a PAC's failure to disclose a sponsor in its statement of organization so that citizens signing petitions are not misled. But the dissent fails to explain why this public protection goal cannot be achieved through Title 16. Here, for example, Plaintiffs could have filed a complaint with the Secretary as early as February and at least by mid-April (after the Committee filed its first required campaign finance report revealing NextGen as a substantial donor) alleging that the Committee's statement of organization was false because it failed to list NextGen as a sponsor. The Secretary could have investigated and referred any violation to the Attorney General, and the Committee could have taken corrective action by disclosing NextGen as a sponsor (if required) or faced an enforcement action that may have nullified its statement of organization and thus its ability to continue to act. The benefit of pursuing the Title 16 remedy early is obvious: waiting until hundreds of thousands of signatures are gathered to address the issue, as the dissent contends should occur, risks disenfranchising citizens who signed petitions because they supported the Initiative.

¶26 In sum, even though the Committee was required to file its statement of organization with the initiative application, *see* § 19-111(A), the statement's contents are not governed by chapter one of Title 19. Further, nothing in Title 19 authorizes the Secretary to reject a facially valid statement that did not, in fact, comply with § 16-906(B). Thus, even if the Committee's statement of organization failed to meet § 16-906(B)'s requirements, that deficiency neither nullified the initiative application under § 19-111(A) nor voided the later-collected signatures pursuant to § 19-114(B). To the extent the court of appeals suggested otherwise in *Israel v. Town of Cave Creek*, 196 Ariz. 150, 155 ¶ 24 n.7 (App. 1999), we disapprove it. Plaintiffs' claim did not establish grounds for invalidating the Initiative under § 19-122(C), and the trial court properly dismissed this claim.

## II. Legally sufficient title

¶27 The Initiative's title declares that the measure amends the constitution "to require electricity providers to generate at least 50% of their annual sales of electricity from renewable energy sources." Plaintiffs argue this is false and misleading because the Initiative applies only to electricity providers that are also "public service corporations" and not others, most notably Salt River Agricultural Improvement and Power District. We review this issue de novo as a mixed question of fact and law. *See Wilmot v. Wilmot*, 203 Ariz. 565, 568–59 ¶ 10 (2002).

¶28 A "full and correct copy of the Title and text of the measure" must be attached to all petition sheets. Ariz. Const. art. 4, pt. 1, § 1(9); *see also* §§ 19-112(B), -121(A)(3) (both to same effect). All that is constitutionally and statutorily required is "some title and some text." *Arizona Chamber of Commerce & Indus. v. Kiley*, 242 Ariz. 533, 541 ¶ 31 (2017). Nevertheless, in *Kromko v. Superior Court*, this Court criticized using extraneous "short titles" in petition sheets that "contain[] either untrue representations designed to defraud potential signatories, or highly inflammatory language calculated to incite partisan rage." 168 Ariz. 51, 59 (1991).

¶29 The Initiative's title is not deceptive. It accurately states that the measure affects "electricity providers." Although the title does not mention that the Initiative applies only to "public service corporations" that provide electricity, such detail is neither required nor necessary to avoid misleading voters. *Cf. id.* at 60 (noting the initiative title was misleading "if at all" because it was incomplete and concluding that "[w]e cannot say that a title's failure to describe every aspect of a proposed measure always

creates the degree of fraud, confusion, and unfairness sufficient to invalidate the petition upon which the title rests"). Importantly, an initiative's title gives notice of the measure's subject matter—no more, no less. *See Dennis v. Jordan*, 71 Ariz. 430, 439 (1951) (stating "it is not necessary that the title be a synopsis or a complete index of the legislation that is to follow" but suffices if it "indicate[s], in a general way at least, what is to follow in the way of legislation" and "put[s] anyone having an interest in the subject matter on inquiry" (emphasis removed) (internal quotations omitted)). The Initiative's title served this purpose by notifying interested parties that the measure imposes renewable-energy-source requirements on "electricity providers." Interested voters are placed on notice to read the Initiative's text for details, which include that the measure applies only to "public service corporations." The trial court correctly rejected Plaintiffs' challenge.

### III. Sufficient number of valid signatures

¶30 The Committee submitted 480,707 signatures to the Secretary, which, if valid, far exceeded the 225,963 signatures required to place the Initiative on the ballot. The trial court invalidated 79,252 signatures for various reasons not at issue here, leaving 401,455 potentially valid signatures. To disqualify the Initiative from the ballot, therefore, Plaintiffs were required to prove by clear and convincing evidence that at least another 175,493 signatures were invalid (401,455 – 175,493 = 225,962). *Cf. McClung v. Bennett*, 225 Ariz. 154, 156 ¶ 7 (2010) (stating burden for challenging signatures to candidate nominating petitions).

### A. Improper circulator registration

¶31 Paid circulators who collect signatures for statewide ballot measures must register with the Secretary before circulating petitions. § 19-118(A). Among other information, the registration must include a proper service-of-process address. § 19-118(B)(2). A failure to properly register can result in a circulator's removal or disqualification. § 19-118(A).

¶32 The trial court rejected Plaintiffs' request to invalidate 116,098 signatures gathered by circulators who had not designated proper service-of-process addresses on their registration forms. The court reasoned that these circulators were not required to register as "paid circulators," and their failure to provide proper addresses therefore did not invalidate their petition sheets. Plaintiffs argue the court misinterpreted § 19-118(F)'s definition of "paid circulator" and, alternately, erred because the

circulators' voluntary registration required them to provide a service-of-process address in compliance with § 19-118(B)(2).

**¶33**      At the time pertinent to events here, § 19-118(F) (2017) provided as follows:

> For the purposes of this title, "paid circulator":
>
> 1. Means a natural person who receives monetary or other compensation that is based on the number of signatures obtained on a petition or on the number of petitions circulated that contain signatures.
>
> 2. Does not include a paid employee of any political committee organized pursuant to title 16, chapter 6, unless that employee's primary responsibility is circulating petitions to obtain signatures.

(Footnote omitted.) We interpret § 19-118(F) de novo with the goal of effecting legislative intent. *See Ryan v. Napier*, 245 Ariz. 54, 64 ¶ 41 (2018). If the provision has only one reasonable interpretation, we apply it without further analysis. *Id.* If more than one reasonable interpretation exists, we will apply secondary interpretive principles. *Id.*

**¶34**      We agree with the trial court that the circulators here were not "paid circulators" as defined in § 19-118(F). Section 19-118(F)(1) unambiguously defined "paid circulator" as a person whose compensation is based on the number of signatures collected or petitions circulated. *See SolarCity Corp. v. Ariz. Dep't of Revenue*, 243 Ariz. 477, 480 ¶ 8 (2018) ("The best indicator of [legislative] intent is the statute's plain language . . . ."). The circulators here were paid by the hour. Applying the plain language of § 19-118(F)(1), therefore, the circulators were not "paid circulators" required to register.

**¶35**      Plaintiffs nevertheless argue that § 19-118(F)(2) expanded the definition of "paid circulator" to include a PAC employee whose "primary responsibility is circulating petitions to obtain signatures," regardless of the basis for compensation. They assert that the circulators were the Committee's employees and, because their primary responsibilities were circulating petitions, they were "paid circulators" under (F)(2).

¶36 Even assuming the circulators were Committee "employees," an issue we do not decide, Plaintiffs' position is contradicted by (F)(2)'s plain language. Subsection (F)(2) did not define "paid circulator" but instead described what the definition in (F)(1) "[did] not include"— employees whose primary responsibility was not circulating petitions. Subsection (F)(2) was an exception, not a rule. The caveat in (F)(2) ("unless that employee's primary responsibility is circulating petitions to obtain signatures") limited the exception and kept the employee category described in the caveat within the definition of "paid circulator" if (F)(1) otherwise applied.

¶37 Plaintiffs assert that interpreting § 19-118(F)(1) as setting forth the single definition for "paid circulator" and viewing (F)(2) as an exception is absurd and contrary to the legislative intent, as evidenced by A.R.S. § 19-118.01. In 2017, twenty years after enacting the definition of "paid circulator" in § 19-118(F), the legislature added § 19-118.01, prohibiting circulators from being paid based on the number of signatures collected and declaring any violation a misdemeanor, but left the definition of "paid circulator" in § 19-118(F) intact. 2017 Ariz. Sess. Laws, ch. 52, § 3 (1st Reg. Sess.). Thus, anomalously, circulators are prohibited from being paid by the signature but if paid by the signature, they must register.

¶38 Sections 19-118(F) and 19-118.01 cannot be reconciled. *Cf. State v. Francis*, 243 Ariz. 434, 435 ¶ 6 (2018) (stating that courts seek to give meaning to all intersecting statutes). Even if we interpreted § 19-118(F)(2) as defining "paid circulator" rather than providing an exception to the (F)(1) definition, the conflict with § 19-118.01 would remain because (F)(1) was unaltered. And assuming the 2017 legislature intended to nullify § 19-118(F)(1) and apply (F)(2) as Plaintiffs interpret it, the legislature did not amend § 19-118(F) to reflect that intent. The enactment of § 19-118.01 alone could not alter the plain meaning of § 19-118(F). *Cf. United States v. Price*, 361 U.S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); 2A Sutherland Statutory Construction § 48:20 (7th ed. 2018) ("[C]ourts generally give little or no weight to the views of members of subsequent legislatures about the meaning of acts passed by previous legislatures.").

¶39 Rewriting § 19-118(F) to cure the anomaly created by enactment of § 19-118.01 was a task for the legislature, which it undertook the next legislative session. Effective August 3, 2018, § 19-118(F) defines "paid circulator" as "a natural person who receives monetary or other

compensation for obtaining signatures on a petition or for circulating petitions for signatures" unless an employee exclusion applies. Had this definition been in effect during the events here, the circulators would have been required to register. But it was not, and the trial court did not err in interpreting the prior version of § 19-118(F) as not applying to circulators paid by the hour.

¶40 We also reject Plaintiffs' alternate argument that by voluntarily registering with the Secretary, the circulators were required to provide a proper service-of-process address per § 19-118(B)(2), and their failure to do so should have invalidated all signatures they collected. Section 19-118(B) provides requirements only for "registration required by subsection A," which, as relevant here, applies to "paid circulators." Because the circulators here are not "paid circulators," subsection (A) did not impose the registration requirement that subsection (B) addressed. The circulators' voluntary registration did not require them to comply with subsection (B).

¶41 Relatedly, the circulators' declarations that the information in the registration forms was "true, complete, and correct" did not make their registrations "unlawful." *See* § 19-118(D) (authorizing any person to "challenge the lawful registration of circulators"). Subsections (A) and (B), the only provisions addressing the requirement to register and the form of registration, were inapplicable. Nothing required any registration, voluntary or mandatory, to be made under oath. In short, even assuming the circulators made false declarations, this did not make their registrations "unlawful" and subject to challenge under § 19-118(D).

¶42 Our resolution of this issue is consistent with the trial court's ruling that § 19-118(C) applied to disqualify signatures collected by circulators who did not appear at trial after being served with subpoenas. Unlike subsection (B), which applies only to registrations required by subsection (A), subsection (C) has no such restriction: "If a registered circulator is properly served with a subpoena" and fails to appear, "all signatures collected by that circulator are deemed invalid." Thus, if a circulator registers voluntarily, he or she is "a registered circulator" and subsection (C) applies.

¶43 In sum, the circulators here were paid on an hourly basis and were therefore not "paid circulators" required to register with the Secretary. Their voluntary registration did not require them to comply with

§ 19-118(B)(2), and their failure to provide proper service-of-process addresses did not make their registrations "unlawful" and subject to challenge under § 19-118(D). The trial court did not err by refusing to invalidate 116,098 signatures collected by these circulators.

## B. Exhibit C issues

¶44 Plaintiffs attached to their second amended complaint a spreadsheet identifying one or more deficiencies in 384,459 petition signatures ("Exhibit C"). At Plaintiffs' request before trial, and without objection, the trial court ordered the Committee to provide Plaintiffs with a written response to these challenges within eleven days. The Committee complied by providing its own spreadsheet, created from its pre-existing quality control research, identifying which challenged signatures had "no problem," a "potential problem," or were "unreviewed." The Committee failed to make any notation regarding several thousand signature lines because, according to counsel, the Committee had not conducted research regarding those lines.

¶45 Plaintiffs moved to strike 272,245 signatures on Exhibit C to which the Committee had responded by noting anything other than "no problem." They argued that Exhibit C was part of the complaint, and the court's order for a response meant the Committee was required to deny the alleged signature deficiencies or they would be admitted, as would occur with any answer. *See* Ariz. R. Civ. P. 8(c)(6). Relatedly, Plaintiffs later moved to strike about 46,000 signatures based on the Committee's failure to make any responsive notation to those signatures within Exhibit C. The court denied both motions, reasoning its prior order was one for expedited discovery and did not require the Committee to "stipulate or admit" to Plaintiffs' challenges.

¶46 Plaintiffs argue the trial court erred because the Committee's "calculated decision not to admit the invalidity of signatures it knew to be invalid should not benefit the Committee." But this argument incorrectly presupposes that the Committee was required to admit or deny the Exhibit C challenges. The court's discussion with counsel that culminated in the order for a response to Exhibit C makes clear that the court entered a discovery order. Nothing required admissions or denials. The court did not abuse its discretion by denying the motions. *Cf. State v. Acuna Valenzuela*, 245 Ariz. 197, 207 ¶ 11 (2018) ("We review a trial court's evidentiary rulings for an abuse of discretion . . . .").

¶47        Exhibit C was admitted in evidence at trial, and Plaintiffs' political consultants testified and explained how their organizations identified the signature line deficiencies reflected in that document. Thereafter, Plaintiffs moved to shift the burden of proof to the Committee because it had not responded to or denied many Exhibit C challenges.[2] The trial court denied the motion, reasoning, "the mere fact that you've put on evidence doesn't mean that the burden then shifts.  I still have to evaluate the evidence that you put on.  And if you haven't met your burden, then the burden doesn't shift and there's nothing that the defendants need to do."

¶48        In contesting this ruling, Plaintiffs argue that the burden shifted to the Committee because it "had superior access to the information that formed the basis for Plaintiffs' objections." *See Parker v. City of Tucson*, 233 Ariz. 422, 432 ¶ 24 n.9 (App. 2013) ("[T]here is support for the notion that a party with superior knowledge about and access to evidence regarding certain facts should bear the burden of producing that evidence, rather than charging the adverse party with the task of proving a negative."); *Healey v. Coury*, 162 Ariz. 349, 354–55 (App. 1989) (upholding jury instruction stating that "the burden of proof as to a matter which is peculiarly within the knowledge or control of the opposite party is placed on that party").  Plaintiffs claim the Committee had superior access to information because it had four months "to conduct quality control" while the petitions circulated whereas Plaintiffs had only two weeks to examine the petitions, and the Committee had access to its circulators to address issues.

¶49        The trial court did not err.  Plaintiffs did not (and do not here) identify any information within the Committee's control that Plaintiffs could not access.  Indeed, in a Herculean effort, Plaintiffs reviewed all petition signatures, challenged 384,459 signatures based on twenty-seven categories of purported deficiencies, and subpoenaed more than 1100 circulators to testify.  The fact that the Committee had more time to analyze information does not mean it had superior access sufficient to shift the

---

[2] Plaintiffs did not specify whether the burden should shift concerning all or only a portion of the challenged signatures.  On appeal, Plaintiffs contend that the court's failure to shift the burden requires invalidation of 272,245 signatures.

burden of proof. If that were so, the burden would rarely, if ever, be placed on a challenger in election cases, considering their expedited nature.

¶50         Plaintiffs next argue the trial court erred by failing to accept Exhibit C as a "summary [or] chart . . . to prove the content of voluminous writings." *See* Ariz. R. Evid. 1006. But Exhibit C was admitted in evidence, and the court relied on it in deciding the challenges, even though the court reviewed some signatures individually. Plaintiffs have not directed us to any ruling refusing to consider this exhibit or requiring them to address each signature individually, and our review of this voluminous record has not turned up one. It appears the issue was not raised to the trial court and is therefore waived. *See Ryan*, 245 Ariz. at 66 ¶ 53.

¶51         Finally, Plaintiffs argue the trial court erred by failing to resolve challenges to 72,014 signatures based on various deficiencies, as set forth in Exhibit C. The court concluded it did not need to address these challenges because invalidating 72,014 signatures would still leave a sufficient number to qualify the Initiative for the ballot. Plaintiffs agree that this group of signature challenges is not dispositive but contends it could be in combination with other challenges. Plaintiffs do not ask us to remand to the trial court to rule on these challenges. Rather, they argue these signatures should be invalidated because "the Committee failed to rebut [the] evidence" on these challenges. But Plaintiffs fail to develop this argument. They do not identify which signatures comprise this group, the bases for objection, or what other evidence impacted these challenges. The Committee asserts it provided rebuttal evidence. In short, we cannot assess whether Plaintiffs satisfied their burden of proof as to these challenges, and we do not attempt to do so. *See id.* To the extent Plaintiffs assert the Committee admitted these challenges or bore the burden to disprove them, we reject those arguments for the reasons previously explained.

### C. Objection 12: voter registration

¶52         The trial court rejected Plaintiffs' Exhibit C "objection 12" that thousands of signatures should be invalidated because the signatories' names and addresses did not match the statewide voter registration database. *See* §§ 19-112(C) (requiring signatories to be registered voters), -122(B) (designating the "most current version of the general county register statewide voter registration database" as "the official record to be used to determine on a prima facie basis by the challenger that the signer of a petition was not registered to vote at the address given on the

date of signing the petition"). Plaintiffs argue the court erred by relieving the Committee of the burden to demonstrate that the signatures were nevertheless valid.

¶53 Before addressing Plaintiffs' argument, we consider the Committee's cross-appeal assertion that Plaintiffs were restricted to challenging signatures within the five percent random sample submitted by the Secretary to the county recorders, *see supra* ¶ 6, and that the trial court erred by ruling otherwise. This issue is moot considering our holding permitting placement of the Initiative on the ballot. Because the issue is likely to recur, however, we address it to provide guidance in future cases. The issue is a legal one, which we review de novo. *See Twin City Fire Ins. Co. v. Leija*, 244 Ariz. 493, 495 ¶ 10 (2018).

¶54 The Secretary is not required to check whether a signatory was a registered voter at the time he or she signed the petition. Instead, the county recorders examine petition signatures in the five percent random sample and certify the number of signatures disqualified for statutorily enumerated reasons, including voter non-registration. *See* A.R.S. § 19-121.02(A), (B). These certifications establish a signature validity rate, which the Secretary applies to the total number of eligible signatures. *See* § 19-121.04(A)(3). Section 19-121.03(B) authorizes any citizen to challenge the county recorders' certifications, which, if successful, would change the validity rate.

¶55 The Committee argues that because the random sample process provides the only mechanism for reviewing compliance with § 19-112(C)'s voter registration requirement, § 19-121.03(B) necessarily provides the exclusive remedy for challenging signatures on that basis. It adds that permitting a challenge to signatures outside the random sample would be unworkable because it could conflict with the valid signature count derived from the random sample process or result in double counting.

¶56 We agree with the trial court that Plaintiffs were entitled to challenge petition signatures outside the random sample based on voter non-registration. Section 19-122(C) authorizes any person to contest an initiative based on "compliance with this chapter," which includes § 19-112(C)'s voter registration requirement. Nothing suggests that § 19-121.03(B) precludes such a challenge. *Cf. Kromko*, 168 Ariz. at 55–56 (stating that a former, similar version of § 19-122(C) "permits any citizen to

19

explore beyond the county recorder's certification and question the overall legal sufficiency of an initiative petition," and noting that "[t]he elector status of each signatory . . . is only one of the many facets of the court's inquiry into whether a petition is legally sufficient under § 19-122(C)").

¶57 We are not persuaded that permitting a challenge that encompasses signatures outside the random sample would be so unworkable that the legislature could not have intended to authorize it. The random sample process establishes procedures for the Secretary and county recorders to follow to determine whether an initiative has a sufficient number of valid signatures for placement on the ballot. Those officials are not required to exclude any non-compliant signatures identified in a private action under § 19-122(C). If the valid signature count totaled by the Secretary would qualify the measure for the ballot while the count identified by the § 19-122(C) plaintiff would not, the trial court would resolve the conflict as it resolves other conflicts in election challenges.

¶58 Turning now to Plaintiffs' challenge, we confront a signature calculation dispute. The trial court found that 116,237 signatures were subject to objection 12 while Plaintiffs contend that the correct number is 179,119. Resolving the dispute is imperative. Even if 116,237 signatures are invalidated, the Initiative petition would still exceed the 225,963 signatures required to place the Initiative on the ballot (401,455 – 116,237 = 285,218). But if Plaintiffs' calculation is correct, the Initiative petition would fail to meet the required mark (401,455 – 179,119 = 222,336).

¶59 Plaintiffs have not shown that the trial court erred by finding that objection 12 applied to 116,237 signatures. To support its 179,119 calculation, Plaintiffs rely on a chart created for this appeal, which they say is derived from four trial exhibits. But Plaintiffs do not explain how 179,119 is calculated from the exhibits, which contain more than thirty thousand pages, and our cursory review was unenlightening.

¶60 In contrast, the trial court's 116,237 calculation is supported by the record. Objection 12 originally challenged 204,740 signatures. During trial, that number was reduced as signatures subject to objection 12 were invalidated for other reasons. At the start of the final trial day, Plaintiffs informed the court that objection 12 then applied to 117,519 signatures and introduced a demonstrative chart to that effect. *See* trial exhibit 5687. At the end of the day, Plaintiffs updated the chart to reflect that objection 12 applied to 116,237 signatures. *See* trial exhibit 5689.

¶61      The trial court's finding that objection 12 applied to 116,237 signatures was not clearly erroneous.  *See Shooter v. Farmer*, 235 Ariz. 199, 200 ¶ 4 (2014).  Because invalidating those signatures would not disqualify the Initiative from the ballot, we do not further address the merits of objection 12.

### D.  A.R.S. § 19-118(C)

¶62      The trial court applied § 19-118(C) to invalidate numerous signatures gathered by circulators who did not appear at trial after being served with subpoenas.  The Committee challenges this ruling on cross-appeal and argues that, as applied here, § 19-118(C) violates the constitutional right of initiative.  *See* Ariz. Const. art. 4, pt. 1, § 1–2.  Because the Initiative qualified for the ballot without the invalidated signatures, we do not address this argument.

### CONCLUSION

¶63      We affirm the trial court's judgment denying injunctive relief to Plaintiffs.

BALES, C.J., joined by PELANDER, J., concurring.

**¶64**       I join fully in the majority's careful disposition of this complex case and write separately only to address an argument made by our dissenting colleagues.  As they point out, the majority does not decide whether the NextGen Action Committee is a sponsor for purposes of A.R.S. § 16-906(B).  *Infra* ¶ 73.  The dissent contends that NextGen had to be identified as a sponsor in CEHA's statement of organization and name.  I disagree.  When § 16-906(B) is properly construed along with other provisions in Title 16, NextGen falls outside the definition of "sponsor" even though it provided nearly all the contributions to CEHA after the political action committee's formation.  Regardless of whether Plaintiffs can challenge the adequacy of CEHA's organizational statement or name under A.R.S. § 19-122(C), their claims based on NextGen's alleged status as a sponsor fail.

**¶65**       Section 16-906(B) requires that, if a committee is sponsored, the committee must include the name of its sponsor in the committee's name.  Section 16-901(47), in turn, defines a sponsor as "any person that establishes, administers, or contributes financial support to the administration of a political action committee or that has common or overlapping membership or officers with that political action committee."  If these two statutes were the only relevant sections of Title 16, our dissenting colleagues might be correct that NextGen is a sponsor of CEHA.  Read literally and in isolation, these provisions might suggest that any "person" that establishes or contributes financial support to a political action committee is a "sponsor."  That reading is mistaken, however, because we must consider the "context of the statute" when interpreting its meaning.  *See Glazer v. State,* 237 Ariz. 160, 163 ¶ 12 (2015).

**¶66**       Section 16-906 can only sensibly be understood in context. Under A.R.S. § 16-911(B)(9), payments made by a sponsor "for the costs of establishing, administering, and soliciting contributions from its employees, members, executives, stockholders, and retirees" are excluded from the definition of "contribution", which in turn exempts such payments from the campaign finance reporting requirements of A.R.S. § 16-926.  Thus, § 16-906's requirement for the identification of a "sponsor" serves to ensure that the ongoing relationship between an entity and its affiliated political action committee (e.g., one operated by a corporation or labor union) is reflected in the committee's name and organizational statement, as such support is not otherwise required to be reported as campaign contributions.

¶67        The rationale for § 16-906(B) is further illuminated by other provisions of Title 16.   In that title, there is only one provision that specifically authorizes sponsorship – § 16-916(B).   That section authorizes corporations, limited liability companies, and labor organizations to sponsor a separate segregated fund.  Such a fund must register as a political action committee.   A.R.S. § 16-916(C)(1).   Thus, sponsors are those corporations, LLCs, and unions that create separate segregated funds, and thereby may lawfully use entity resources to support committees that can make direct candidate contributions that may not be permitted for the entities themselves.  Such a construction matches federal law, to which our own statutes refer.   *See* A.R.S. § 16-916(C)(5) (referencing 52 U.S.C. § 30118(b)).

¶68        The fact that NextGen made nearly all the contributions to CEHA after its formation – contributions that were publicly reported pursuant to Arizona's campaign finance laws – does not mean that NextGen was a sponsor.   Every functioning political action committee is established by some person, and all monetary contributions received by such a committee to some degree support its administration (either directly or by freeing up other funds for administrative costs).   But creating a committee or making reportable contributions to it cannot suffice to make someone a sponsor.  Such an interpretation would be contrary to the plain language of § 16-906(B), which expressly contemplates that a committee may not be sponsored at all.  Moreover, requiring even major contributors to be identified as sponsors would be unworkable, as it would result in unwieldy committee names that could require amendment as contributors change.  (This problem is not avoided by the dissent's novel interpretation proposing that only those contributors who "actually" contribute to the administration of the committee, *infra* at ¶ 97, qualify as sponsors.)  Instead, when considered in context, the term "sponsor" in § 16-906(B) is most reasonably understood as referring to an entity sponsoring an affiliated committee as allowed by A.R.S. § 16-916(B).  NextGen is not such an entity.

¶69        The dissent seems particularly concerned that not identifying NextGen as a sponsor could perpetrate some great deception on Arizona's citizens.  But other provisions of Title 16 address that concern.  Contributions made by NextGen to CEHA are subject to periodic reporting requirements – and there is no contention here that those requirements have been violated.  Moreover, the legislature has specified when it believes it appropriate for committees to otherwise identify their major funding

sources. In its current version, A.R.S. § 16-925(B) requires committees to identify in their campaign advertising the names of the three political action committees "making the largest aggregate contributions to the political action committee making the expenditure and that exceed twenty thousand dollars during the election cycle." This requirement – which did not apply to CEHA because NextGen is not itself a political action committee – is narrower than the statute's predecessor, which applied to contributors broadly and not only other political action committees. *See* A.R.S. § 16-912.01 (2015). (Incidentally, the principal committee opposing Proposition 127 – Arizonans for Affordable Electricity – received all its funding from one source (some $30 million from Pinnacle West Capital Corporation) without identifying that contributor in its name or advertising.)

¶**70** Our campaign finance and disclosure laws seek to facilitate free and open elections. Those same laws, however, are complicated, technical, and legitimately subject to persons structuring campaign strategies within the existing legal requirements. Those requirements did not require CEHA to identify NextGen as its sponsor. If that conclusion raises concerns about the adequacy of our disclosure requirements, they should be addressed by the legislature, and not by this Court stretching A.R.S. § 16-906(B) to apply in a way neither compelled by the statutory language nor recognized in prior administrative guidance or caselaw.

PELANDER, J., concurring.

**¶71**        I join in the majority's analysis regarding the interplay between Title 16 and Title 19 and its conclusion that Plaintiffs may not "contest the validity of the Initiative based on the statement of organization's alleged non-compliance with § 16-906(B)." *Supra* ¶ 20; *see also supra* ¶ 26.  But I share the dissent's concerns regarding the need for full, honest disclosure of those who actually spearhead and fund initiative measures, and the danger of misleading or deceiving petition signers (inadvertently or intentionally) when such information is lacking.  In addition, reasonable minds may differ on the meaning and scope of "sponsor" as broadly defined in § 16-901(47), but on that point I join in the Chief Justice's concurring opinion.  Given the sharp differences of opinion among the justices on the meaning, overlap, and application of key Title 16 and 19 provisions in this context, legislative review and clarification would be helpful so that everyone knows and complies with the applicable requirements regarding initiatives.

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

GOULD, J., joined by BOLICK, J., and LOPEZ, J., concurring in part and dissenting in part.

¶72          The Committee received millions of dollars—essentially all of its funding—to circulate petitions for its Initiative from one source: "NextGen Climate Action" ("NextGen"), a San Francisco-based organization. Nonetheless, the Committee never disclosed NextGen as its sponsor. This conduct violated Title 19 (A.R.S. §§ 19-101 to -161) rendering the Committee's petition signatures void. As a result, the Initiative should not have been placed on the ballot.

¶73          The majority, however, never reaches this issue. Rather, it concludes that Plaintiffs, as private parties, have no remedy under Title 19. I disagree. Section 19-122(C) allows Plaintiffs to bring a private cause of action to strike the Committee's petition signatures. As a result, while I concur in the remainder of the majority's decision, I dissent on this issue.

**I.**

¶74          Plaintiffs allege two separate causes of action under A.R.S. § 19-122(C). The first cause of action alleges that the Initiative is invalid because the Committee violated Title 19. *See* § 19-122(C) (permitting "[a]n action that contests the validity of an initiative . . . based on . . . compliance with this chapter"). Specifically, Plaintiffs assert that the Committee failed to disclose NextGen as a sponsor in its statement of organization, committee name, and initiative application. As a result, they contend that the Committee's statement of organization and initiative application are invalid, and all of its petition signatures are void pursuant to A.R.S. § 19-114(B). As to this claim, Plaintiffs have named the Secretary of State as a party solely because she is the public officer responsible for approving the Initiative for placement on the ballot. *See* A.R.S. § 19-121.04(B) (stating the Secretary of State must certify and approve whether an initiative has a sufficient number of signatures to be placed on the ballot).

¶75          Plaintiffs' second claim is based on the actions of the Secretary of State. *See* § 19-122(C) (permitting "[a]n action that contests the validity of an initiative . . . based on the actions of the secretary of state"). Plaintiffs assert that because the Committee failed to disclose NextGen as a sponsor on its statement of organization and initiative application, the Secretary of State should have rejected these "defective" documents and declined to issue the Committee a serial number to circulate initiative

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

petitions.

¶76        I agree with the majority's conclusion that Plaintiffs have failed to allege a cognizable claim against the Secretary of State.  No statute requires the Secretary of State to investigate or reject a statement of organization or initiative application that appears, on its face, to be complete.  Moreover, as a practical matter, when these documents are filed, the Secretary of State does not have the time or information to determine whether they contain errors or omissions.

¶77        However, Plaintiffs' first cause of action under § 19-122(C) is distinct from its claim against the Secretary of State.  Section 19-122(C), by its terms, provides that "[a]ny person" can "contest the validity of an initiative" based on "compliance with this chapter."  In *Kromko v. Superior Court*, 168 Ariz. 51 (1991), we recognized that this statute creates a broad private cause of action.  There, plaintiffs asserted that defendants' initiative petitions were invalid under § 19-122(C) because they contained misleading, extraneous short title descriptions.  *Kromko*, 168 Ariz. at 53, 57.  As a general matter, no statute expressly prohibited defendants from placing extraneous short titles on their petitions.  *Id.* at 59.  However, we held that simply because there was no express prohibition, defendants could not circulate petitions in "*any* form" they chose, nor could they use "short titles containing . . . untrue representations designed to defraud potential signatories."  *Id.* at 59.  In reaching this conclusion, we stated that fraud in the election process is hard to detect, and that allowing "lay citizens" to assert a cause of action under § 19-122(C) assists in "keep[ing] the circulation process free from fraud."  *Id.* at 56; *see also id.* at 59–60.  Thus, we held that § 19-122(C) "permits any citizen to explore" the "*overall legal sufficiency* of an initiative petition."  *Id.* at 55–56 (emphasis added); *see also Israel v. Town of Cave Creek*, 196 Ariz. 150, 155 ¶¶ 24–25 & n.7 (App. 1999) (holding that a genuine factual dispute existed as to whether defendant's petition signatures were invalid under § 19-114(B) because defendant failed to disclose that he was supported by an "organization" on his referendum application).

¶78        In short, Plaintiffs' private cause of action under § 19-122(C) is not limited to whether the Secretary of State should have rejected the Committee's statement of organization or its application.  It also is not limited to the information the Committee chose to disclose in these documents.  Rather, § 19-122(C) allows Plaintiffs to pursue a cause of action

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

based on the Committee's failure to disclose NextGen as a sponsor.

**II.**

¶79        In Arizona, a political action committee ("PAC") must disclose whether it is sponsored by any person or organization. This disclosure requirement is robust. When a PAC files its statement of organization, it must include the "name, mailing address, e-mail address, website, if any, and telephone number of any sponsor." A.R.S. § 16-906(B)(2). Additionally, the "sponsor's name, or commonly known nickname" must be incorporated into the name of the PAC. § 16-906(B)(1)(b). Thus, "[f]or example, if the PAC is established and funded by the National Rifle Association or the Sierra Club, the terms 'NRA' or 'Sierra Club' must appear in the PAC's title." *See* Office of the Sec'y of State, *Initiatives and Referenda* 6 (2017).[3]

¶80        In terms of disclosure, requiring PACs to incorporate sponsors in their committee name has ramifications extending far beyond the statement of organization itself. When a PAC files an application to circulate initiative petitions, it must list its committee name—which necessarily includes the name of any sponsor—on its application. A.R.S. § 19-111(A). Perhaps most importantly, the committee name must be included in campaign advertisements and solicitations. *See* A.R.S. § 16-925(A)–(D). Thus, a PAC is effectively required to disclose the name of a sponsor in most campaign advertisements and solicitations. *See id.*

¶81        Requiring a PAC to disclose its sponsors is essential to preventing fraud. As stated in *Van Riper v. Threadgill*, 183 Ariz. 580, 583 (App. 1995), "it is important for interested parties to know exactly who is backing a referendum drive." Thus, "it is reasonable to require individuals to file a form which discloses whether they are acting alone or in concert with others." *Id.*

¶82        At least one other jurisdiction has enjoined an initiative from being placed on the ballot due to a PAC's failure to disclose a sponsor. In

---

[3] The Secretary of State's handbook is entitled to some weight. Arizona law requires that the Secretary of State, each election cycle, "publish an initiative, referendum and recall handbook that provides guidance on interpreting, administering, applying and enforcing the laws relating to initiative, referendum and recall." A.R.S. § 19-119.02.

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

*Loontjer v. Robinson*, the plaintiff, a private party, sought an injunction to prevent an initiative from being placed on the ballot. 670 N.W.2d 301, 303–04 (Neb. 2003). The plaintiff asserted that the defendants violated a statute requiring a PAC, before gathering signatures on an initiative petition, to "file[] with the Secretary of State" a "sworn statement containing the names and street addresses of every person, corporation, or association sponsoring the petition." *Id.* at 307 (quoting Neb. Rev. Stat. § 32-1405(1)). The plaintiff argued that the defendants violated this law by submitting an unsworn statement and omitting the street addresses of individuals and organizations sponsoring the initiative. *Id.* at 307–09.

¶83 The Nebraska Supreme Court ruled in favor of the plaintiff. *Id.* at 309. The court explained that "the sworn statement provision is mandatory" and is not an "onerous" requirement; rather, it promotes accountability and prevents fraud in the initiative process. *Id.* at 308–09. The court further explained that the sponsor requirement "allows the public to make an informed judgment whether to sign the petition." *Id.* at 308; *see also Hamilton Twp. Taxpayers' Ass'n v. Warwick*, 434 A.2d 656, 658 (N.J. Super. Ct. App. Div. 1981) (holding that a referendum petition was legally insufficient because the petitions did not include the names of the referendum sponsors, and stating that "[t]he evident legislative purpose of the requirement . . . is to inform voters, who are solicited for their signatures, who the sponsors of the petition are . . . not only to enable the voters to charge the sponsors with responsibility as agents but to guide the voters whether to sign"); *cf. Thompson v. Jaeger*, 788 N.W.2d 586, 592 (N.D. 2010) ("The obvious purpose of the constitutional mandate that the petition contain the sponsors' names and addresses is to provide material information to potential signers when they contemplate signing the petition.").

### III.

¶84 The majority contends that because Title 16 (specifically, § 16-906(B)) requires a PAC to disclose its sponsors, then Title 16 necessarily provides the exclusive procedure for enforcing this requirement. *See* A.R.S. § 16-938. To allow a private party to pursue a separate cause of action under § 19-122(C), it reasons, "would nullify these Title 16 provisions." *See supra* ¶ 24.

¶85 Neither Title 16 nor Title 19 supports such a narrow construction. As noted above, § 19-122(C) creates a broad private cause of action for violations of Title 19; the statute, by its terms, does not limit or

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

bar an action simply because a related government enforcement action exists under Title 16.

¶86      Here, the Committee violated *both* Title 16 *and* Title 19. Specifically, § 16-906 and § 19-111(A) required the Committee to file a statement of organization with the Secretary of State. This document, regardless of whether it was filed pursuant to § 16-906 or § 19-111(A), required the Committee to disclose the name of any sponsor. *See supra* ¶ 79. Additionally, before the Committee could circulate any petitions, it had to file an initiative application disclosing the name of any sponsor. *See supra* ¶ 80.

¶87      Allowing Plaintiffs to bring a private cause of action under § 19-122(C) does not render the available Title 16 remedy superfluous. Government enforcement actions under Title 16 are separate and distinct from Title 19 proceedings. Title 16 "contains a comprehensive statutory scheme governing election campaign finance," whereas Title 19 "governs initiatives and referenda." *Pacion v. Thomas*, 225 Ariz. 168, 169 ¶ 6, 170 ¶ 11 (2010). In addition, the two statutory schemes provide different remedies. "The legislature expressly chose in § 19-114(B) to disqualify signatures on initiative and referendum petitions obtained before formation of a [PAC], yet [under Title 16] provided only a civil penalty for violations of the campaign finance statutes governing candidates." *Id.* at 170 ¶ 12.

¶88      The fines and suspensions provided under Title 16 are not designed to fully address a Title 19 violation. *See* A.R.S. § 16-937(A)–(D); § 16-938(A), (C)(1), (E)(2), (F)–(I) (discussing the imposition of fines and suspensions for violations of Title 16). When a PAC conceals the name of a sponsor during the petition signature process, voters may sign the petition without knowing exactly who is sponsoring the initiative. In short, voters are deprived of information that may have affected their decision to sign the petition. *See supra* ¶¶ 81-83. Imposing a fine or suspension *after* the voters have signed the petitions under these circumstances is not an adequate remedy. Rather, the proper remedy is to strike the signatures that were obtained under these misleading circumstances. *See* § 19-114(B).

¶89      However, as support for its argument that Title 16 provides the exclusive remedy, the majority contends that here, the voters could have been protected from the Committee's failure to disclose its sponsor "through Title 16" "as early as February and at least by mid-April." *See supra* ¶ 25. There are several flaws in this argument. Based on the record,

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

nothing would have alerted Plaintiffs that NextGen was a sponsor in February. The Committee's original statement of organization and application certainly make no reference to NextGen. Indeed, there were no public filings indicating NextGen's role as sponsor until the Committee's April 17 campaign finance report. As noted above, for the thousands of uninformed voters who may have signed the initiative petitions before that date, Title 16 does not provide a suitable remedy. *See supra* ¶ 88.

**¶90** More importantly, assuming there was sufficient information to initiate a Title 16 action by mid-April, it does not follow that Plaintiffs are, as a matter of law, precluded from bringing an action under Title 19. If a Title 16 action had been initiated in April, this might have allowed the Committee to correct its defective filings and obtain enough signatures to place the Initiative on the ballot. But the duty to comply with the law is on the Committee, and its failure to do so is not grounds to abrogate the important right of all citizens in this state to pursue a private cause of action under § 19-122(C). In some circumstances early detection of fraud might not be possible; there is no guarantee that such conduct will come to light before the filing deadline for initiative petitions. Section 19-122(C) serves as an important backstop in keeping the initiative circulation process free from fraud. As we stated in *Kromko*, "fraudulent conduct in connection with the circulation or signing of a petition may be very difficult for even state officials to detect," and therefore a private cause of action under § 19-122(C) is vital "to keep[ing] the circulation process free from fraud." 168 Ariz. at 56. In short, if the legislature's goal is to prevent fraud and ensure that the public knows who is sponsoring a PAC, that goal is best served by allowing enforcement actions under both Title 16 and Title 19.

## IV.

**¶91** The question, then, is whether NextGen is a sponsor. If it is, the Committee violated Title 19 and the Initiative is invalid.

## A.

**¶92** In Arizona, a sponsor is defined broadly. It includes "any person" that "establishes," "administers," "contributes financial support to the administration of [a PAC]," or that has "common or overlapping membership or officers" with a PAC. A.R.S. § 16-901(47). Additionally, the term "[p]erson" is defined as "mean[ing] an individual or a candidate, nominee, committee, corporation, limited liability company, labor organization, partnership, trust, association, organization, joint venture, cooperative or unincorporated organization or association." § 16-901(39).

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

¶93 Section 16-901(47), by its terms, does not apply to a person or an organization that simply contributes money to a PAC. *N. Valley Emergency Specialists, L.L.C. v. Santana*, 208 Ariz. 301, 303 ¶ 9 (2004) (explaining that a statute's language is "the best and most reliable index" of its meaning (citation omitted)). Rather, the contributions must be directed "*to the administration of*" a PAC. § 16-901(47) (emphasis added). Stated another way, a person or organization is not a sponsor unless it can be proven that they actually contributed funds to pay the administrative costs and expenses necessary to operate a PAC.

¶94 The statute's legislative history supports this construction. *See State ex rel. Montgomery v. Harris*, 234 Ariz. 343, 345 ¶ 13 (2014) (stating that if a statute's language is ambiguous, we will consider its relevant legislative history in construing its meaning). The current definition was proposed by the Secretary of State and was drafted to make it clear that the term "sponsor[]" applies to "groups that establish, administer or contribute financial support to the administration of the committee, *rather than just making contributions to the committee*." *Ariz. H.R. Minutes of Comm. on Judiciary*, 41st Leg., 2d Reg. Sess. 7 (Mar. 17, 1994) (emphasis added).

¶95 In his concurring opinion, Chief Justice Bales contends that the term "sponsor" only applies to corporations or labor unions that establish "separate segregated funds" to make financial contributions to political candidates. *See supra* ¶¶ 66-67; *see also* § 16-916(B), (C)(1)–(2) (stating that corporations and labor unions may sponsor a separate segregated fund to support political candidates and that such funds must register as a PAC). I disagree.

¶96 In Arizona, sponsors are defined broadly, and include virtually any individual or group. *See supra* ¶92. Our statutes do not limit the definition of a sponsor to corporations and labor unions establishing separate segregated funds. *See supra* ¶92. Indeed, the Secretary of State, who drafted the current statutory definition, has not restricted the application of sponsor to corporate and union PACs. *See supra* ¶ 79. In contrast, the Legislature *has* specifically limited the application of statutes regarding PACs based on "separate segregated funds" to those "established by a corporation, limited liability company, labor organization or partnership." § 16-901(45).

¶97 Chief Justice Bales' concern that Arizona's broad statutory definition of a sponsor results in "unwieldy committee names" and

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

eliminates unsponsored PACs is based on the unwarranted assumption that any person or organization contributing money to a PAC qualifies as a sponsor. *See supra* ¶ 68. As noted above, a person or group does not qualify as a sponsor simply by contributing to a PAC. *See supra* ¶¶ 93-94. Rather, a sponsor is limited to those persons or organizations that actually contribute "to the administration of" a PAC. *See supra* ¶¶ 93-94.

**B.**

¶98 Title 19 requires a PAC to file a statement of organization and an initiative application listing the name of any sponsor. *See supra* ¶¶ 79-86. A PAC is not authorized to conceal or omit the identity of a sponsor in these documents; to permit such a noncompliant, defective filing would render the filing provisions in §§ 19-111(A) and -114(B) meaningless. *See State v. Thompson*, 204 Ariz. 471, 475 ¶ 10 (2003) (stating that "we avoid constructions that would render statutes invalid or parts of them meaningless").

¶99 When a PAC files a statement of organization or initiative application that fails to disclose a sponsor, such documents are invalid, and do not satisfy the filing requirements of § 19-111(A). As a result, pursuant to § 19-114(B), any signatures obtained based on such defective filings are void. *See Israel*, 196 Ariz. at 155 ¶ 24 n.7 ("We note that a failure to make a required organizational listing does not, strictly speaking, invalidate an application under A.R.S. § 19-111(A). Instead, pursuant to A.R.S. § 19-114(B), it invalidates any signatures obtained on referendum petitions circulated pursuant to an insufficient application. The effect, however, is the same, for it renders an insufficient application a futility."); *cf. State ex rel. Steele v. Morrissey*, 815 N.E.2d 1107, 1109, 1112, 1114 (Ohio 2004) (per curiam) (holding that a pre-circulation "certified copy" of initiative petition "filed" before a proponent circulated and obtained the requisite signatures was invalid; evidence showed that pre-circulation petition was, in fact, not properly attested under the statutory definition of a "certified copy," thus invalidating initiative petition).

**C.**

¶100 The Committee's lack of disclosure began when it filed its original statement of organization and its initiative application. The Committee did not list a sponsor in either of these documents. It also did not incorporate the name of any sponsor in its committee name. Rather, the Committee represented that it was an unsponsored PAC until May 14,

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

2018.[4] Then, for the first time, it listed the LLC as a sponsor in its amended statement of organization.

**¶101** The facts, however, show that the Committee *was* a sponsored PAC after the LLC was formed. Daryl Tattrie served as the Committee's Treasurer and as one of the LLC's "Members." Thus, the LLC qualified as a sponsor because it shared "common or overlapping membership" with the Committee. § 16-901(47). Indeed, counsel for the Committee conceded that the LLC was a sponsor. Nonetheless, the Committee waited over two months to disclose the fact that it was a sponsored PAC.

**¶102** Perhaps this was a careless oversight. But this pattern of nondisclosure continued with NextGen. The Committee did not list NextGen as a sponsor in either its original or amended statement of organization. Additionally, the Committee has never incorporated NextGen into its committee name.

**¶103** The Committee's campaign finance reports, however, show that NextGen was a sponsor. Indeed, NextGen helped establish the Committee and has been involved in administering the Committee since its inception. *See Mathieu v. Mahoney*, 174 Ariz. 456, 457 n.1 (1993) (stating that this Court may take judicial notice of public records filed with the Secretary of State). In its first-quarter report, the Committee's Treasurer avowed that, at the time the Committee registered as a PAC, it had no cash on hand. *See* A.R.S. § 16-907(I) (requiring a PAC to "report all contributions, expenditures and disbursements that occurred *before qualifying* as a committee" (emphasis added)). The Committee's first contribution came from NextGen on February 22, 2018, or just two days after it filed its application to begin circulating initiative petitions. *See* § 19-111(A)–(B); A.R.S. § 19-121(A). This in-kind contribution of $141,666.67 was for "Goods/Services" for "Petition Gathering through Fieldworks, LLC," and was used to assist in "register[ing] 1,652 circulators to collect signatures on behalf of the Initiative." Additionally, the initial report shows that on

---

[4] According to Plaintiffs, the Committee asserts that the Clean Energy for a Healthy Arizona, LLC (the "LLC") was its sponsor during this period. Characterizing the Committee's argument in this way, Plaintiffs argue the LLC could not have been a sponsor because it did not come into existence until February 27. Plaintiffs misunderstand the Committee's position. As noted above, the Committee asserts that it had *no* sponsor during this period.

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

March 31, 2018, NextGen gave the Committee a $65,680.00 in-kind contribution for "Staffing and Overhead."

**¶104**     Throughout the petition circulation process, virtually all of the Committee's funding and in-kind support came from NextGen. In short, NextGen provided the only viable source of funding to operate and administer the Committee. The Committee's first-quarter report (filed April 17) shows it received $957,346.67 from NextGen, while all other contributions were $0. Indeed, from the Committee's inception until the petitions were filed on July 5, NextGen contributed $6,857,346.67 to the Committee; all other contributions combined were $318.36. *See* Clean Energy for a Healthy Ariz., *Campaign Finance Report: Amended 2018 6th Report (1st Quarter)* (2018), https://apps.azsos.gov/apps/election/cfs/search/PublicReports/2018/6970C81E-5195-4311-92F0-75B5A05F2F80.pdf [https://perma.cc/2GMR-3896]; Clean Energy for a Healthy Ariz., *Campaign Finance Report: Amended 2018 7th Report (2nd Quarter)* (2018), https://apps.azsos.gov/apps/election/cfs/search/PublicReports/2018/8857E34A-F8E7-43EE-BCFA-A66A8C654176.pdf [https://perma.cc/ZK6W-9AV7]; Clean Energy for a Healthy Ariz., *Campaign Finance Report: 2018 8th Report (Pre-Primary)* (2018), https://apps.azsos.gov/apps/election/cfs/search/PublicReports/2018/874642B3-5BC9-4915-B5BE-DC12977922DA.pdf [https://perma.cc/6ADD-8CWJ].

## V.

**¶105**     Under the Arizona Constitution, the people of Arizona have the power to propose and enact laws by initiative. Ariz. Const. art. 4, pt. 1, § 1(1)–(2). However, our citizens also have the right to an initiative process that is transparent and free from fraud. Thus, we recognized in *Kromko* that citizens should not be deprived of the right to challenge "the legal sufficiency of initiatives" because

> [t]his would run counter to the general spirit of the initiative and referendum, which recognizes "no reason why the interest of a citizen may not be as great in preventing an initiative petition not legally sufficient from being submitted to a vote as in compelling that one legally sufficient should be so submitted."

35

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

*Kromko*, 168 Ariz. at 56 (quoting *Barth v. White*, 40 Ariz. 548, 553 (1932)); *cf.* Ariz. Const. art. 7, § 12 (stating the legislature has the authority to enact "registration and other laws to secure the purity of elections and guard against abuses of the elective franchise").

¶106　　　Here, the Committee is proposing an amendment to the Arizona Constitution. If enacted, this measure is immune to repeal by the legislature. Ariz. Const. art. 4, pt. 1, § 1(6)(B). Additionally, the legislature may not amend it unless such amendment passes by a three-fourths supermajority in each house and furthers the purpose of the measure. *Id.* art. 4, pt. 1, § 1(6)(C). On a matter of such great public importance, it is not too onerous to require the Committee to follow the law and disclose its sponsor to the voters.

¶107　　　The Committee suggests, however, that even if NextGen qualified as a sponsor, its support of the Initiative was fully disclosed in its campaign finance reports. These reports do show NextGen's financial contributions to the Committee. However, this information was not available to the people who signed the Initiative petitions before the Committee filed its first campaign finance report on April 17. And, of course, if the Committee had properly disclosed NextGen as a sponsor, voters may well have learned that NextGen was sponsoring the Initiative when—by virtue of the committee name—they read the Committee's solicitation letters or watched its campaign advertisements.

¶108　　　In either case, it is not up to the Committee to decide how it will comply with the law. It must comply with both the campaign finance requirements of Title 16 *and* the sponsor disclosure requirements of Title 19. Here, Title 19 required the Committee to disclose NextGen as a sponsor. It is no defense that the Committee believed the disclosure laws were not very effective, or that there were "better" ways to disclose NextGen as a sponsor. It is also no defense that other PACs, including those opposing the Initiative, may have failed to disclose their sponsors. *See supra* ¶ 69. No person or organization is above the law, and regardless of its political position on an initiative, a PAC must disclose its sponsors.

## VI.

¶109　　　Finally, although the majority does not address this issue, I would reverse the trial court's dismissal of Plaintiffs' claim on the grounds of laches. Plaintiffs filed their § 19-122(C) claim ten business days after the Committee filed its initiative petitions with the Secretary of State. This does

LEACH v. REAGAN/
CLEAN ENERGY FOR A HEALTHY ARIZONA
JUSTICE GOULD, joined by JUSTICES BOLICK and LOPEZ
Concurring in part and Dissenting in part

not constitute delay, much less unreasonable delay; indeed, filing suit before the Committee filed its petitions would raise issues of ripeness.

¶110 Although NextGen's financial contributions have been available to the public since April 2018, it would be unreasonable to expect private parties to investigate and call attention to potential legal violations at the risk of foreclosing a then-unripe private cause of action—especially where there is no guarantee that a circulating initiative measure will garner the requisite signatures to qualify for the ballot. *See Senate of Cal. v. Jones*, 988 P.2d 1089, 1097 (Cal. 1999) ("It would place an unreasonable and unrealistic burden on those who may wish to challenge an initiative measure, as well as on the courts, to adopt a rule that would require any preelection challenge to an initiative measure to be brought while petitions still are being circulated and prior to the time that a measure qualifies for the ballot."). Thus, because no delay occurred, laches does not bar Plaintiffs' claim.